Gladys Arroyo López y otros, demandantes y recurridos, v. Estado Libre Asociado de Puerto Rico, Departamento de Recursos Naturales, Autoridad de Energía Eléctrica y CNA Casualty of Puerto Rico, demandados y recurrentes.

*Número:* RE-88-379          *Resuelto:* 29 de junio de 1990

*Miguel Limeres Grau*, de *Parra, Del Valle, Frau & Limeres*, abogado de la Autoridad de Energía Eléctrica y CNA Casualty of Puerto Rico, recurrentes; *Antonio Montalvo Nazario*, abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

## I

El 4 de julio de 1982 Gladys Arroyo López y un grupo de familiares y amigos se encontraban disfrutando de un pasadía en

las inmediaciones del Lago Guajataca.(1) Allí compartían con una persona identificada solamente como "Don Frank" quien, pasado el mediodía, los invitó a dar un paseo en un pequeño bote de aluminio de aproximadamente ocho (8) pies de eslora. Dicho bote, desprovisto de salvavidas, tenía un motor de menos de diez caballos de fuerza. La invitación fue aceptada y realizaron cuatro viajes. En contraste con los anteriores, en el último se subieron más personas adultas. El botecito fue ocupado por Isidro Méndez (170 libras) y Salvador Rosado (200 libras) en la proa; Eloísa Arroyo (130 libras), la menor Marisol Rosado Arroyo (70 libras), y Vicenta Arroyo (140 libras) al centro, y por "don Frank" (170 libras) en la popa.(2) Durante la travesía pasó cerca de ellos, causando olas, una lancha que tiraba de un esquiador. Alegadamente esto provocó que el botecito hiciera agua, se virara y cayeran al lago todos sus ocupantes. A consecuencia del lamentable accidente, murieron ahogados Isidro Méndez, Salvador Rosado y la menor Marisol Rosado Arroyo. Eloísa Arroyo, Vicenta Arroyo y "Don Frank" lograron salvarse.(3)

Así las cosas, el 14 de octubre de 1982 Gladys Arroyo —viuda de Isidro Méndez— por sí y en representación de sus hijos Aracelis y Eliezer Méndez Arroyo; Vicenta Arroyo —viuda de Salvador Rosado— por sí y a nombre de sus hijos Dámaso y Salvador Rosado Arroyo, y Eloísa Arroyo, presentaron en el Tribunal Superior, Sala de Aguadilla, demanda de daños y perjuicios contra el Estado Libre Asociado y la Autoridad de Energía Eléctrica (Autoridad). Alegaron que tanto el Estado como la Autoridad incumplieron su deber de supervisión y vigilancia del

---

(1) Se encontraban en el lugar —un establecimiento llamado "La Chopa"— entre otros, Eloísa Arroyo, la familia Rosado Arroyo, compuesta por Salvador Rosado, Vicenta Arroyo y sus hijos Dámaso, Salvador y Marisol, y la familia Méndez Arroyo, compuesta por Isidro Méndez, Gladys Arroyo y sus hijos Aracelis y Eliezer.

(2) Los pesos anteriormente reseñados surgen de la evidencia presentada ante el tribunal de instancia. Si tomamos en consideración el peso del motor, el bote llevaba aproximadamente 880 libras de carga. Según el testimonio del perito Rafael Boglio Martínez, la norma es que un bote de aluminio de doce (12) pies no debe llevar un peso combinado de más de quinientas setenta y cinco (575) libras de peso.

(3) Al momento del juicio, Don Frank había fallecido. Desconocemos la causa de su muerte.

Lago Guajataca al permitir que se utilizaran festinadamente embarcaciones propulsadas por motores de gran caballaje, creándose así una situación de desorden y caos. Dicha demanda fue enmendada en múltiples ocasiones para, entre otras cosas, incluir como codemandados a *CNA Casualty of Puerto Rico* —compañía aseguradora de la Autoridad— a Mario Casanova —dueño del bote que alegadamente provocó el accidente— su esposa y la sociedad de gananciales compuesta por ambos. No obstante, Casanova y su esposa nunca fueron emplazados.

Previa vista al efecto, el Tribunal Superior, luego de evaluar toda la evidencia oral y documental presentada, concluyó que la falta de supervisión y vigilancia por parte de la Autoridad fue una de las causas del accidente, pues ello permitió el uso desmedido y desordenado del lago. Dicho foro entendió que el documento titulado "Procedimiento para otorgar el permiso para pescar y pasear en bote en los lagos que administra la Autoridad de las Fuentes Fluviales" (Apéndice 25, pág. 87) imponía a la Autoridad la obligación de evitar que el Lago Guajataca fuera utilizado sin ningún control. A su vez, expresó que la Autoridad incumplió dicha obligación al no proveer adecuada supervisión ni ejercer la debida vigilancia. En cuanto al Estado, dictaminó que —debido a la insuficiencia de la prueba presentada en su contra— el Departamento de Recursos Naturales no tenía la obligación ni jurisdicción para intervenir y administrar el Lago Guajataca y, por ende, no era responsable de su supervisión, mantenimiento y vigilancia. Por último, encontró que la ausencia de salvavidas en el bote, el exceso de peso y el oleaje provocado por otra embarcación fueron causas concurrentes del accidente.

En vista de ello, el Tribunal Superior atribuyó un 30% de negligencia a los demandantes y 70% a la Autoridad. Como resultado, condenó solidariamente a la Autoridad y a su aseguradora a pagar $152,500, las costas, intereses y $10,000 por honorarios de abogado.

Inconforme, la Autoridad acude a este Foro. Revisamos.

## II

Erró el tribunal de instancia al imponer responsabilidad a la Autoridad. Nos explicamos.

■ Nuestra jurisprudencia reiteradamente ha señalado que, al amparo del Art. 1802 de nuestro Código Civil, 31 L.P.R.A. sec. 5141, todo daño o perjuicio, moral o material, da lugar a la correspondiente reparación si concurren tres (3) elementos: *primero*, la producción de un daño; *segundo*, un acto u omisión culposo o negligente, y *tercero*, la existencia de un nexo causal entre el daño y la acción u omisión de otra persona. *Soc. Gananciales v. G. Padín Co., Inc.*, 117 D.P.R. 94 (1986); *Jiménez v. Pelegrina Espinet*, 112 D.P.R. 700 (1982); *Pérez Escobar v. Collado*, 90 D.P.R. 806 (1964); *Hernández v. Fournier*, 80 D.P.R. 93 (1957).

■ Bajo este esquema la doctrina reconoce que una omisión genera responsabilidad civil si constituye conducta antijurídica imputable. Es decir, si la omisión del alegado causante del daño quebranta un deber impuesto o reconocido por ley de ejercer, como lo haría un hombre prudente y razonable, aquel grado de cuidado, diligencia, vigilancia y precaución que las circunstancias le exigen. H.M. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, San Juan, Pubs. J.T.S., Vol. I, pág. 173.

■ Por lo tanto, para determinar si se incurrió o no en responsabilidad civil resultante de una omisión, los factores a considerar serán la existencia o inexistencia de un deber jurídico de actuar por parte del alegado causante del daño —cuyo incumplimiento constituye antijuridicidad— y si de haberse realizado el acto omitido se hubiera evitado el daño. *Soc. Gananciales v. G. Padín Co., Inc.*, supra.

■ Siguiendo esta tónica, ante una reclamación fundada en responsabilidad por omisión, la pregunta de umbral es si existía

un deber jurídico de actuar de parte del alegado causante del daño.

En el caso ante nos, el foro de instancia determinó que el documento utilizado por la Autoridad para otorgar permisos de pesca y paseo en bote le imponía el deber de vigilar, supervisar y tomar las debidas precauciones para evitar que se utilizara el lago desordenadamente por embarcaciones de todos tipos y tamaños. El referido documento establece que "la Autoridad permite solamente el deporte de la pesca y paseo en botes en estos [l]agos con la previa obtención de un permiso" y que "[t]oda otra clase de actividad o deporte fuera del propósito útil de estos lagos queda totalmente prohibid[a]". Apéndice 25, pág. 88. A su vez, prohíbe la concesión de permisos a aquellos botes con motores de más de diez (10) caballos de fuerza.

Por su parte, la Autoridad alega que a tenor con lo dispuesto en la Ley para la Conservación, el Desarrollo y Uso de los Recursos de Agua de Puerto Rico —Ley de Aguas de 1976 (12 L.P.R.A. sec. 1501 *et seq.*— es el Estado, a través del Cuerpo de Vigilantes de Recursos Naturales, quien tiene el deber de ejercer la debida inspección y vigilancia sobre los cuerpos de agua de Puerto Rico.[4]

La prueba tiende a sostener este enfoque. Sobre el particular el Ing. Jorge E. Cancel Lugo —quien se desempeñó como Supervisor del Distrito de Riego de Isabela desde 1975 hasta 1985— señaló que durante dicho período la Autoridad *no concedió permiso alguno para pasear en bote por el Lago Guajataca*. A su vez explicó que, a partir de la creación del Departamento de Recursos Naturales, éste era quien tenía la obligación de evitar que entraran al lago embarcaciones sin la debida autorización. Como cuestión de hecho, Recursos Naturales tenía allí personal, patrullas, botes y el reglamento para hacerlo valer. E.N.P. pág. 9. Además expresó, con respecto al Lago Guajataca, que la Autoridad *únicamente* vigilaba la seguridad de la presa, inspeccionaba y supervisaba el equipo allí existente, controlaba el flujo de agua

---

[4] Ley Núm. 136 de 3 de junio de 1976 (12 L.P.R.A. sec. 1501 *et seq.*).

que baja por la misma según el nivel del lago y las necesidades requeridas diariamente por el Sistema de Riego de Isabela y de los Acueductos que se abastecen de dicho lago. Declaró, además, que en diversas ocasiones Recursos Naturales intervino con los dueños de los negocios ubicados a la orilla del lago y les *advirtió que no podían permitir la utilización de sus terrenos para tirar botes al lago y que, mucho menos, podían cobrar por ello.* E.N.P., pág. 9. Añadió que varias veces, con el fin de evitar la entrada ilegal al lago, la Autoridad compareció ante la Administración de Reglamentos y Permisos (A.R.Pe.) para oponerse al establecimiento de diferentes tipos de negocio en las inmediaciones del mismo, e incluso notificó a la fiscalía de Aguadilla sobre esta situación. E.N.P., pág. 10.

## III

█ La Ley de Aguas de 1976, específicamente dispone que será obligación del Secretario de Recursos Naturales ejercer la debida inspección y vigilancia sobre *todos* los cuerpos de agua de Puerto Rico. Más aún, para asegurar el efectivo cumplimiento de tal obligación existe el Cuerpo de Vigilantes de Recursos Naturales, creado mediante la Ley Núm. 1 de 29 de junio de 1977 (12 L.P.R.A. sec. 1201 *et seq.*).[5] Según ésta, el Cuerpo de Vigilantes de Recursos Naturales tendrá el deber de inspeccionar y vigilar todos los cuerpos de agua. Además, le otorga la facultad para

---

[5] "Para el descargo eficiente y responsable de las leyes que administra el Secretario del Departamento de Recursos Naturales, es menester conferirle los instrumentos y mecanismos necesarios para procesar administrativa y judicialmente a los violadores de éstas. El notable aumento que se ha estado registrando en las actividades ilegales en detrimento y destrucción de nuestros recursos naturales, justifica la creación de un Cuerpo que garantice la integridad, preservación y conservación de los referidos recursos. Este organismo y su funcionamiento permitirá que el Departamento de Recursos Naturales pueda ejercer eficientemente su responsabilidad como guardián y custodio de los recursos naturales.

"Este Cuerpo de Vigilantes, tendrá también la responsabilidad de velar por la protección de nuestros recursos naturales para uso, goce y disfrute de nuestro pueblo; vigilar por la observación de las leyes y reglamentos que protegen el ambiente y evitan la contaminación de éste y ejerciendo también las funciones de policía dentro de todas las áreas bajo la jurisdicción del Departamento de Recursos Naturales." Exposición de Motivos de la Ley Núm. 1 de 29 de junio de 1977, Leyes de Puerto Rico, pág. 559.

investigar y requerir la presentación de cualquier permiso, franquicia, resolución, licencia o documento otorgado por la autoridad competente que acredite la autorización de cualquier actividad u operación bajo la jurisdicción y competencia del Departamento de Recursos Naturales en terrenos públicos o privados dentro de los límites del Estado Libre Asociado de Puerto Rico. Dicho Cuerpo también tendrá la facultad para realizar arrestos por tentativa o violación a la Ley de Aguas de 1976, cuando la misma se haya cometido en presencia de los miembros del Cuerpo de Vigilantes.[6]

Ciertamente, la legislación precitada impone al Cuerpo de Vigilantes la obligación de inspeccionar y vigilar las inmediaciones del Lago Guajataca. Ello no es incompatible con el control que la Autoridad conservaba sobre una parte de la presa.

■ Ante este trasfondo fáctico, forzoso es concluir que la Autoridad no tenía el deber y la obligación de vigilar y supervisar todas las inmediaciones del Lago Guajataca a los fines de impedir que se utilizara desordenadamente por botes de todos tipos y tamaños. Esa obligación había pasado a manos de Recursos Naturales.

## IV

Independientemente de lo expuesto —y aun bajo la hipótesis de tener la Autoridad un deber jurídico de actuar— no medió el nexo causal necesario para responder por los daños.

■ Como anteriormente expresamos, el deber de indemnizar requiere la existencia de un nexo causal entre el daño y el acto u omisión culposo o negligente. El hecho de que no se cumpla con alguna ley, reglamento o norma establecida no es motivo para que se tenga que responder civilmente por un daño, a menos que exista relación causal entre dicha violación y el daño causado.

---

[6] Art. 5 de la Ley Núm. 1, *supra,* que crea el Cuerpo de Vigilantes de Recursos Naturales del Departamento de Recursos Naturales, 12 L.P.R.A. sec. 1205.

*Pacheco v. A.F.F.*, 112 D.P.R. 296, 302 (1982). En materia de relación causal, nos regimos por la teoría de la causalidad adecuada, conforme la cual no es causa toda condición sin la cual no se hubiese producido el resultado, sino aquella que ordinariamente lo produce según la experiencia general. *Jiménez v. Pelegrina Espinet*, supra.

A su amparo, la cuestión se reduce a determinar si la ocurrencia del daño era de esperarse en el curso normal de los acontecimientos o si, por el contrario, queda fuera de ese posible cálculo. J. Santos Briz, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Rev. Der. Privado, 1984, T. XXIV, pág. 267. Es decir, para que exista relación causal la acción u omisión tiene que ser idónea para producir el efecto operado; tiene que determinarlo normalmente. A fin de establecer esa vinculación de causa y efecto entre esos dos (2) sucesos, tenemos que realizar un análisis retrospectivo de posibilidad. En vista de ello, no es suficiente que un hecho aparezca como condición de un evento si regularmente no trae aparejado ese resultado. La causalidad está necesariamente limitada por el ámbito de la obligación, pues es infinita la serie de daños que, en interminable encadenamiento, pueden derivarse del incumplimiento de una obligación. *Estremera v. Inmobiliaria Rac., Inc.*, 109 D.P.R. 852, 857 (1980).

Bajo esta normativa, concluimos que en el caso de autos la falta de vigilancia y supervisión de la Autoridad no fue la causa adecuada del lamentable accidente. El botecito de aluminio, en circunstancias *normales*, estaba diseñado y era capaz de rebasar, sin mayor dificultad, el oleaje alegadamente provocado por el bote de Casanova. En otras palabras, la falta de supervisión y vigilancia que le fue imputada a la Autoridad no fue la causa del accidente. El hecho de que se hubiese permitido la entrada al lago de botes con motores de gran caballaje nada tuvo que ver con el hundimiento de la pequeña embarcación.

*La ausencia de salvavidas en el bote, el exceso de peso y su mala distribución fueron los factores que realmente provocaron el accidente.* El bote no sólo llevaba exceso de peso, sino que, para

agravar la situación, estaba mal distribuido, causando con ello que el bote perdiera toda su flotación. En ese último viaje, la mayor parte del peso descansaba sobre la proa, ocasionando que el bote navegara con ésta bastante hundida en el agua. En tales circunstancias era evidente que, sin importar el tamaño de la ola a la cual se enfrentara, le hubiese sido imposible rebasarla. Según el testimonio de Rafael Boglio Martínez —perito de la parte demandada— la condición de la embarcación era sumamente crítica y estaba propensa a sufrir un colapso en cualquier momento. Señaló, además, que desde que abordaron el botecito, los demandantes corrían un riesgo altísimo de naufragar.(7) E.N.P., pág. 17. La alegada omisión de la Autoridad no constituyó conducta que aumentara o provocara ese riesgo. La señalada ausencia de causación entre el accidente y el supuesto incumplimiento por la Autoridad de su deber de supervisión y vigilancia en el lago, para que no penetraran al mismo botes con motores de más de diez (10) caballos de fuerza, impide una determinación de responsabilidad.

Por los fundamentos anteriormente expuestos, *se dictará la correspondiente sentencia revocatoria.*

La Juez Asociada Señora Naveira de Rodón concurre con el resultado sin opinión escrita. El Juez Asociado Señor Hernández Denton concurre únicamente en cuanto a las Partes I, II y III. El Juez Asociado Señor Rebollo López no intervino.

---

(7) Boglio Martínez también indicó que una embarcación debe estar levantada de proa, de manera que cuando desarrolle velocidad pueda llegar al punto óptimo de navegación para que cuando alcance este punto entonces se ponga en posición horizontal sobre el agua. Señaló que mientras menos caballaje tiene el motor de una embarcación, menor oportunidad tendrá para levantar la proa, por lo que a menor caballaje, mayor importancia tendrá el peso y su adecuada distribución. Por último, expresó que está reconocido por la Guardia Costanera que una de las razones por las cuales ocurren más accidentes en los botes es debido al exceso y mala distribución del peso. E.N.P., pág. 16.