# 2000 DTA 95

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL III DE ARECIBO Y UTUADO**

LYDIA ESTHER MARTINEZ, ET ALS
Apelantes

v.

DR. JULIO NARVAEZ REYES ET ALS
Apelados

Núm. KLAN-97-00288

San Juan, Puerto Rico, a 26 de enero de 2000

Panel integrado por su Presidenta, Juez Rivera de Martínez
y los Jueces Rivera Pérez y Soler Aquino

Rivera de Martínez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

La demandante, aquí apelante, acude ante nos mediante recurso de apelación presentado el 31 de marzo de 1997. Solicita la revisión y revocación de una sentencia emitida el 18 de febrero de 1997 por el Tribunal de Primera Instancia, Sala Superior de Arecibo, declarando sin lugar una demanda de daños y perjuicios.

La adecuada comprensión del asunto ante nuestra consideración requiere que expongamos brevemente el trasfondo fáctico y procesal del caso.

### I

El 1 de septiembre de 1992, el Sr. Emérito Díaz Pérez, quien tenía una verruga en la espalda que le estaba creciendo y sangrando, acudió al consultorio del Dr. Segundo González, médico bajo contrato con la Asociación de Maestros. Este, al observar la lesión dermatológica lo refirió a la oficina del Dr. Julio Narváez Reyes, cirujano, cuyas oficinas estaban ubicadas en el pueblo de Arecibo.

Luego de evaluar la condición del paciente, el doctor Narváez le practicó una biopsia excisional, que consistió en una cirujía de carácter curativo mediante la cual llegó al tejido celular subcutáneo y extrajo la verruga. Una vez extirpada la verruga, la envió al Dr. José A. Carro Umpierre para que la sometiera a una evaluación patológica. En la visita de seguimiento para cortarle los puntos al paciente, no le informaron los resultados de dicho estudio por no estar disponible. El doctor Narváez le recetó un medicamento en crema para la inflamación y le indicó que volviera en dos o tres semanas.

En mayo de 1993, el señor Díaz Pérez acudió al hospital, luego de que se le hubiese adormecido todo un lado de su cuerpo. Los resultados de una prueba denominada *"CT Scan"* revelaron que padecía de cáncer en estado metastásico. Posteriormente se descubrió que el informe patológico del tejido que le fuera removido mediante la intervención quirúrgica efectuada por el doctor Narváez, reveló que en ese momento el paciente tenía un tumor canceroso denominado *"nodular melanoma"*, pero nunca se le notificó porque la secretaria del doctor Narváez Reyes colocó el informe patológico en el expediente clínico del paciente en espera de ser discutido con él cuando volviera a la oficina en dos o tres semanas.

Emérito Díaz Pérez murió el 19 de septiembre de 1993. Su viuda, Lydia Esther Martínez Villanueva, su hija, Ruth Noemí Díaz Martínez, y el hijo de crianza del difunto, Isaac Elías Martínez, incoaron demanda de daños y perjuicios en contra del Dr. Narváez Reyes. Alegaron que el doctor Narváez fue negligente al no informarle al paciente que estaba padeciendo de cáncer al momento de obtener los resultados de la biopsia. Por la privación repentina del cariño y consuelo que les ofrecía el señor Díaz Pérez, la viuda reclamó cien mil ($100,000) dólares, su hija trescientos cincuenta mil ($350,000) dólares e Isaac Elías Martínez, cincuenta mil ($50,000) dólares.

La parte demandada presentó su contestación a la demanda el 1 de mayo de 1994. Negó las alegaciones en su contra e interpuso varias defensas afirmativas. Entre otras cosas, alegó que el paciente fue negligente porque nunca acudió a la oficina a buscar los resultados de la biopsia.

El tribunal celebró vista en su fondo para dilucidar si hubo negligencia de la parte demandada. Evaluada la

prueba, dicho foro emitió sentencia el 18 de febrero de 1997 declarando sin lugar la demanda. En síntesis, sostuvo que independientemente de la omisión del doctor Narváez en informarle la condición de *"nodular melanoma"* al paciente, ello en nada contribuyó a la muerte de don Emérito Díaz Pérez.

Inconformes, los demandantes acuden ante nos mediante recurso de apelación y plantean lo siguiente:

*"1. Erró el Honorable Tribunal de Instancia al actuar con prejuicio y parcialidad durante el juicio privando a la parte aquí compareciente de un juicio justo e imparcial y al apreciar la prueba de forma completamente incorrecta y equivocada emitiéndose Determinaciones de Hecho que son contrarias a la prueba desfilada.*

*2. Erró el Honorable Tribunal de Instancia al determinar la existencia de negligencia y descartar implícitamente la posibilidad de que éste le haya ocasionado daños a la parte demandante prescindiéndose de la vista de daños.*

*3. Erró el Honorable Tribunal de Instancia al imputar a los demandantes negligencia de parte del demandado en la supuesta negligencia en la que pudo haber incurrido el difunto.*

*4. Erró el Honorable Tribunal de Instancia al limitar sustancialmente el alcance del testimonio del Dr. Luis R. Soltero Harrington, en forma perjudicial a los derechos de los demandantes, poniéndolos en abierta desventaja frente a la parte demandada.*

*5. Erró el Honorable Tribunal de Instancia al impedir que el perito emitiera opinión sobre la posible alteración de una porción del récord médico del consultorio del Dr. Julio Narváez Reyes, demandado-apelado en este caso.*

*6. Erró el Honorable Tribunal de Instancia al permitir la introducción en evidencia de prueba testifical de parte de los peritos de la parte demandada basada en un informe suplementario rendido por el Dr. J. A. Carro al Lcdo. Daniel Cacho Serrano, del cual nunca se notificó copia a la parte demandante.*

*7. Erró el Honorable Tribunal de Instancia al otorgarle credibilidad al testimonio del Dr. Narváez en cuanto a que la lesión que presentaba Don Emérito al visitar su consultorio había estado quemada previamente.*

*8. Erró el Honorable Tribunal de Instancia al permitirle al demandado utilizar durante su testimonio textos que posteriormente se negó a someter en evidencia."*

El 30 de abril de 1997, la parte demandada-apelada presentó su oposición al recurso. Luego de innumerables incidentes procesales relativos a la exposición narrativa de la prueba, el 29 de octubre de 1999 se presentó ante nos la misma debidamente aprobada por el Tribunal de Primera Instancia. Ante ello, estamos en condiciones de resolver.

## II

En términos generales, los errores planteados, los cuales analizaremos en conjunto, van dirigidos a impugnar la apreciación y valorización que hizo de la prueba el foro de instancia y su determinación de que no hubo relación causal entre la omisión del doctor y la muerte del paciente. Ello requiere que analicemos los testimonios de los testigos presentados por ambas partes. No obstante, debemos tomar en consideración que el caso de autos es uno de negligencia por omisión, según reconocido, tanto por el foro de instancia como por la parte apelada, debido a que el médico co-demandado faltó a su deber de informar a su paciente sobre una condición cancerosa grave, según revelado en un informe de biopsia que llegó a su oficina y no leyó. La culpa de éste por omisión negligente no está en controversia.

Ahora bien, al examinar la relación causal entre la referida negligencia y los daños alegados, el tribunal de instancia determinó que la omisión del médico, Dr. Julio Narváez Reyes, en nada contribuyó al daño consistente en la muerte por cáncer de don Emérito Díaz Pérez.

La prueba testifical presentada por la parte demandante consistió en el testimonio pericial del Dr. Luis Soltero Harrington y la declaración de la viuda de don Emérito Díaz Pérez.

Según surge de la exposición narrativa de la prueba oral estipulada por las partes, el doctor Soltero fue cualificado como perito en cirugía general. Entre otras cosas, declaró que recibió entrenamiento en un hospital de tumores en Indiana entrenando en cirugía del tórax, cuello y vértebra y luego recibió entrenamiento en el área de cirugía oncológica. Explicó cuál era su experiencia operando tumores, afirmando que semanalmente operaba entre cinco y quince casos y de éstos eran tumores entre un 20% y un 25%. Señaló que operaba en ese momento en el Hospital del Maestro, en el Hospital Pavía, en el Hospital Auxilio Mutuo y en el Hospital Metropolitano. Indicó que en su práctica como cirujano y dentro de sus cuatro áreas de especialidad estaban los tumores. Era miembro, para la fecha en que declaró, de la Junta de Tumores del Hospital del Maestro. Entre otros cargos había sido profesor en cirugía de la Escuela de Medicina de la Universidad de Puerto Rico y de la Universidad del Caribe, conocida como "la escuela de Cayey" y era consultor en el Hospital Universitario. Había operado casos de melanoma y había discutido casos de esa naturaleza en la Junta de Tumores.

Tuvo la oportunidad de examinar los resultados de la biopsia, así como los expedientes médicos del difunto, entre otras cosas. Declaró sobre su conocimiento en cuanto a lo que es un melanoma nodular y el método de estudio utilizado para determinar la etapa en que se encuentra la condición.

Destacó que habiendo identificado un melanoma nodular, cualquier médico con el menor conocimiento de la medicina tiene que alertar al paciente y referirlo de inmediato a un oncólogo y que es el paciente, junto a su oncólogo, quien debe decidir cómo enfrentarse a la enfermedad. Señaló que aun cuando el pronóstico sea uno pobre, es al paciente a quien le toca decidir si va o no va a hacer nada. Afirmó que había tratamientos con una efectividad de un 20% a un 25% en que el paciente podía vivir cinco años, pero que al paciente en este caso no se le dio ninguna oportunidad, aunque en el informe se exponía la peligrosidad del tumor. Se preguntó: ¿Cómo uno va a dejar a un paciente con un melanoma nodular y no avisarle ni a él o a la familia para alertarlo de que es un paciente que está en una enfermedad grave y que hay que atender?

Declaró, además, que del informe final del doctor Carro aparecía la siguiente nota: *"la lesión aparece que no está removida en su totalidad"*. Explicó que ante eso lo que procedía, lo que él hubiera hecho y lo que cualquier cirujano hubiese procedido a hacer, era llamar al patólogo de inmediato para conocer la profundidad del melanoma y la gravedad del mismo y operarlo de nuevo y sacarle el resto del tumor. Coincidió con los peritos de la otra parte en que había que referir al paciente a un oncólogo para que decidiera con él cuál era el mejor tratamiento a seguir y el pronóstico. A pesar del pobre pronóstico, consideró que no podía afirmar que no se podía hacer nada porque hay casos que sí responden a las terapias.

Por su parte, la Sra. Lydia Esther Martínez, en síntesis, declaró sobre el hecho de que su difunto esposo no fue notificado de los resultados de la biopsia cuando los mismos fueron recibidos en la oficina del doctor Narváez. Expresó que su esposo fue solo a la visita de seguimiento y que al regresar al hogar llegó bien contento porque el doctor le había dicho que había salido bien y le había recetado unos medicamentos. Que nunca mencionó que tenía que volver al médico. Indicó que ella fue donde el doctor Narváez porque el Dr. Ismael Torres la refirió en junio del año próximo. Explicó que fue a buscar los récords un día y le dijeron que fuera al día siguiente, y que cuando volvió, el doctor no había autorizado que le dieran los resultados. Que la secretaria del doctor la llamó luego y le dijo que fuera allá donde el doctor. Que ella fue al Hospital Dr. Susoni y allí el doctor le preguntó cómo estaba la herida. Entonces le indicó que fuera donde su secretaria que ella le iba a dar los resultados. Que el esposo se puso malo y como el plan era de la Asociación de Maestros, lo llevaron al Hospital Dr. Susoni. Allí le hicieron unos estudios, le dijeron que tenía cáncer y se fueron en una

ambulancia para el Hospital del Maestro. En el Hospital Dr. Susoni le hicieron unos estudios y un *"CT Scan"* y la fecha del informe fue 14 de mayo de 1993. El 21 de junio fue a la oficina del doctor Narváez, referido por el doctor Torres, quien le preguntó si su esposo había tenido alguna lesión.

La parte demandada contó con los testimonios del propio demandado y de los peritos médicos, Dres. Ernesto Rivé Mora y Luis Báez Díaz.

El Dr. Julio Narváez narró el procedimiento quirúrgico que le practicó al señor Díaz Pérez para extraerle la verruga. Expresó que envió al doctor Carro la muestra de patología, y que fue llevada por el mismo paciente, luego de él explicarle dónde era. Alegó que en la visita de seguimiento, le informó al difunto que los resultados de la biopsia no habían llegado y que debía venir por ellos en una cita posterior, a la cual el paciente no asistió. Admitió que era responsable por no haber visto la biopsia, pero sostuvo que de todos modos la expectativa de vida del paciente no hubiera variado de haber conocido los resultados de la biopsia. Consideró que los resultados de los *"CT Scan"* demostraron metástasis que no ocurren normalmente en 5 ó 10 meses, por lo cual debía tener metástasis cuando lo operó. Añadió, no obstante, que de haber visto los resultados, hubiese referido el paciente a un oncólogo. En cuanto al tratamiento paliativo, indicó que hubiese sido para hacer más llevadera su condición porque el mismo alivia, pero no cura. Negó haber visto a la esposa del paciente.

El Dr. Ernesto Rivé Mora, testigo cualificado por el tribunal como perito en cirugía y oncología, declaró haber estudiado los expedientes del difunto y se expresó en torno al diagnóstico y pronóstico del paciente. Consideró, a base de su experiencia, que no se hubiese podido hacer nada para prolongar la vida del paciente. Declaró que el paciente debió haber estado pendiente de los resultados de la biopsia. No obstante, aceptó que de haber sido él, hubiese tratado de conseguir al paciente para informarle del resultado de la biopsia. Indicó que también se hubiese comunicado con el doctor Carro en tales circunstancias, de haber tenido conocimiento del informe.

Finalmente, testificó el oncólogo, Dr. Luis Báez Díaz. Este analizó los expedientes del difunto y, al igual que la posición de los demás peritos, concluyó que el doctor Narváez no cometió una falta que alterara el curso de la enfermedad del paciente. Sin embargo, afirmó que era especulativo decir que era lo qué se hubiera podido hacer para mejorar la calidad de vida del paciente porque había poca información. Señaló, además, que la discreción del paciente hay que respetarla.

En cuanto al seguimiento que se le debe dar a la condición de un paciente, sostuvo que cuando a un paciente se le explica su enfermedad, prognosis y tratamiento, se le orienta que puede obtener segundas opciones y se mantiene informado para que tenga tiempo para decidir qué es lo que va a hacer.

A la luz del resumen de los testimonios que el tribunal tuvo ante sí, analicemos si la decisión del foro de instancia fue correcta.

La responsabilidad civil, derivada de actos u omisiones culposas o negligentes, se rige por lo dispuesto en el Artículo 1802 de nuestro Código Civil, ▪ el cual dispone:

*"El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización."*

Para que exista responsabilidad civil bajo el citado artículo, es necesario que concurran los siguientes elementos: el daño, la acción u omisión negligente y la correspondiente relación causal entre el daño y la conclucta culposa o negligente. *Toro Aponte v. E.L.A,* ___ D.P.R. ___, **97 J.T.S 18**, opinión de 31 de enero de 1997; *Ramírez Salcedo v. E.L.A.,* ___ D.P.R. ___, **96 J.T.S. 41**, opinión de 19 de marzo de 1996.

La culpa o negligencia es la falta del debido cuidado que, a su vez, consiste en no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias.

Al amparo del citado Art. 1802, todo daño o perjuicio, moral o material, da lugar a la correspondiente reparación si concurren tres (3) elementos: primero, la producción de un daño; segundo, un acto u omisión culposo o negligente, y tercero, la existencia de un nexo causal entre el daño y la acción u omisión de otra persona. Bajo este esquema, la doctrina reconoce que una omisión genera responsabilidad civil si constituye conducta antijurídica imputable. Es decir, si la omisión del alegado causante del daño quebranta un deber impuesto o reconocido por ley de ejercer, como lo haría un hombre prudente y razonable, aquel grado de cuidado, diligencia, vigilancia y precaución que las circunstancias le exigen. *Arroyo López v. E.L.A.,* 126 D.P.R. 682 (1990).

Para determinar si se incurrió o no en responsabilidad civil resultante de una omisión, los factores a considerar serán la existencia o inexistencia de un deber jurídico de actuar por parte del alegado causante del daño, cuyo incumplimiento constituye antijuridicidad, y, si de haberse realizado el acto omitido se hubiera evitado el daño. La pregunta es si existía un deber jurídico de actuar de parte del alegado causante del daño. *Arroyo López v. E.L.A., supra; Soc. Gananciales v. González Padín,* 117 D.P.R. 94 (1986).

La necesidad de una convivencia social ordenada impone un deber general de corrección y prudencia en relación con los demás ciudadanos, y el acto es ilícito en sentido extracontractual cuando viola los deberes generales de corrección o conducta correcta; deberes que no están escritos en los códigos, pero que representan el presupuesto mínimo sobreentendido del orden de la vida social. *Toro Aponte v. E.L.A., supra; Ramos v. Carlo,* 85 D.P.R. 353 (1962). El concepto de culpa del Artículo 1802 es tan amplio y abarcador como suele ser la conducta humana. *Reyes v. Sucn. Sánchez,* 98 D.P.R. 305 (1970).

En Puerto Rico rige la doctrina de la causalidad adecuada, enunciativa de que no toda condición sin la cual no se hubiera producido el daño, es causa, sino la que ordinariamente lo produce según la experiencia general. Un daño parece ser el resultado natural y probable de un acto negligente, si después del suceso y mirando retroactivamente, el acto que se alega es negligente, tal daño aparece como la consecuencia razonable y ordinaria del acto. *Toro Aponte v. E.L.A., supra; Miranda v. E.L.A.,* ___ D.P.R. ___, **94 J.T.S. 152,** opinión de 7 de diciembre de 1994.

De otra parte, en lo que a la práctica de la medicina se refiere, en nuestra jurisdicción se espera que el médico ofrezca a su paciente aquella atención médica, cuidados, destrezas, y protección que a la luz de los modernos medios de comunicación y enseñanza y conforme al estado de conocimiento de las ciencias médicas, satisface las exigencias generalmente reconocidas por la propia profesión médica. *Santiago Otero v. Méndez,* ___ D.P.R. ___ (1994), **94 J.T.S. 38,** opinión de 25 de marzo de 1994; *Ramos Robles v. García Vicario,* ___ D.P.R. ___ (1993), **93 J.T.S. 167.** Nuestro ordenamiento jurídico obliga al médico a responder por los daños y perjuicios causados, tan sólo cuando actúa negligentemente, con descuido o falta de la pericia profesional que exigen las circunstancias. *Ríos Ruiz v. Mark,* 119 D.P.R. 316 (1987).

En casos donde se alega impericia médica, la parte demandante tiene la obligación de establecer, mediante preponderancia de la prueba, que el tratamiento médico ofrecido por el demandado, o la ausencia de proveer el tratamiento indicado y correcto, fue el factor que con mayor probabilidad ocasionó el daño sufrido por el paciente. *Santiago Otero v. Méndez, supra; Rodríguez Crespo v. Hernández,* 121 D.P.R. 639 (1988). La parte demandante tiene que probar que el tratamiento suministrado por el demandado no fue el adecuado. *Rosado Rosado v. E.L.A.,* 108 D.P.R. 789 (1979). Sin embargo, no es necesario probar este hecho con exactitud matemática. *Zambrana v. Hospital Santo Asilo de Damas,* 109 D.P.R. 517 (1980).

A tenor de la normativa reseñada y en consideración a la prueba presentada, no hay duda de que la

negligencia del médico en el caso de autos, no le dio al paciente la oportunidad de conocer su enfermedad en un momento en que ya existía un informe sobre la biopsia que identificaba su lesión cancerosa. De esta forma, se le negó al paciente y a su familia la oportunidad de prepararse sicológicamente y planificar su futuro. Se le negó, además, la oportunidad al paciente de explorar todas las alternativas médicas existentes para alargarle la vida y/o mejorarle la condición o calidad de ella y vivir una vida más placentera junto a su familia.

En ningún caso en que se le informe al médico sobre una condición de gravedad o peligro para un paciente, el médico puede quedar relevado de informar a éste de su condición de salud, pues sería absolutamente irrazonable que quedase a la discreción del médico lo que el paciente y su familia pudieran o no hacer con el conocimiento que tengan sobre ello. En el caso de autos, evidentemente cualquier aseveración de que el paciente no podía mejorar en lo absoluto era especulativa. El daño causado al paciente al negarle la oportunidad de enterarse de su condición y hacer algo en su beneficio debe ser compensable.

Nuestro ordenamiento jurídico provee dos tipos de daños: los pecuniarios o económicos y los morales. Los económicos pueden clasificarse como daños emergentes o lucro cesante; los morales son las angustias físicas, angustias mentales, pérdida de compañía, afecto e incapacidad. *Cintrón Adorno v. Gómez,* **99 J.T.S. 20,** opinión de 22 de febrero de 1999.

En el caso de autos, el daño sufrido por la parte demandante estriba en que la negligencia del médico provocó que el paciente se quedara sin opciones que le permitieran haber podido someterse a tratamientos médicos o terapéuticos a tiempo que alargaran o mejoraran la calidad de su vida junto a su familia. Cuando se enteró de lo que tenía, ya era tarde para considerar posibles opciones, inclusive para planificar lo que iba a hacer durante el tiempo que le restaba de vida. Sufrió desmedidamente y murió. Errores como estos, ocasionan que una persona que pudo haber vivido más tiempo, muera antes, y sin haber tenido la alternativa de decidir lo que era mejor o peor para ella y su familia. No hay ninguna justificación para que un médico que hace una biopsia y recibe directamente un resultado desfavorable para el paciente, no lo lea y descanse exclusivamente en que el paciente regrese a la oficina para saberlo. Tampoco es razonable concluir, a base de la prueba presentada, que con toda certeza el paciente iba a morir en la forma y el día en que falleció, no importa a cuántos tratamientos médicos se hubiese sometido, por lo que daba igual que el médico leyera o no el informe sobre la biopsia. Esta teoría abriría las puertas para concederle una amplia licencia a la profesión médica para incurrir en omisiones negligentes que le puedan costar la vida a innumerables pacientes todos los días.

En vista de ello, erró el tribunal al desestimar la demanda. Revocamos la sentencia apelada y ordenamos que se remita el caso al Tribunal de Primera Instancia para que se celebre vista evidenciaria donde la parte demandante tenga la oportunidad de presentar prueba demostrativa de los daños sufridos y la parte demandada de refutar la misma dentro del marco jurídico contemplado en el caso de *Cintrón Adorno v. Gómez, supra.*

### III
Por los fundamentos anteriores, revocamos la sentencia apelada.

El juez Rivera Pérez disiente sin opinión escrita.

Lo acordó el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General