# 2006 DTA 99

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE SAN JUAN**
**PANEL II**

FRANCISCO RAFAEL MIRANDA, NÉLIDA RODRÍGUEZ
Demandantes-Apelados

v.

ALMACENES PITUSA, INC.
Demandado-Apelante

San Juan, Puerto Rico, a 13 de julio de 2006

Panel integrado por su Presidenta, la Juez Peñagarícano Soler,
y los Jueces Rivera Martínez y González Vargas

González Vargas, Troadio, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

La parte demandada-peticionaria Almacenes Pitusa, Inc. ("*Pitusa*") comparece ante este Tribunal para solicitar la revisión de la Sentencia emitida el 10 de marzo 2005 por el Tribunal de Primera Instancia, Sala de San Juan (en adelante, TPI). En ésta se declaró con lugar una demanda en daños y perjuicios instada contra Pitusa por parte de los demandantes, Francisco Rafael Miranda (Sr. Miranda) y su esposa, Nélida Rodríguez.

Luego de considerar las comparecencias de las partes y el derecho aplicable, resolvemos modificar el dictamen revisado y así modificado, confirmar.

### I

El 17 de Agosto de 2000, el Sr. Miranda visitó el Supermercado Pitusa, acompañado de su esposa, con el propósito de hacer unas compras. Se dirigieron al.área de carnicería para la compra de cierto producto, luego de ver un anuncio de veta especial. Al buscar el artículo, el Sr. Miranda resbaló cerca a la carnicería, y cayó de espaldas al suelo, por lo que sintió dolor y molestias en la espalda, cintura, pierna derecha, así como en su

cabeza.

A consecuencia de la caída sufrida, el 7 de marzo de 2001, el Sr. Miranda y su esposa, la Sra. Rodríguez, presentaron demanda en daños y perjuicios contra Pitusa. Alegaron, en síntesis, que la caída sufrida por el Sr. Miranda había ocurrido debido a que en el piso cerca a la carnicería había derramada una sustancia aceitosa y que éste resbaló en ella. La Sra. Rodríguez solicitó indemnización por los daños emocionales sufridos como consecuencia de haber visto sufrir a su esposo como resultado de esa caída.

Por su parte, Pitusa presentó su contestación a la demanda, aduciendo que los daños alegados por los esposos Miranda-Rodríguez, si alguno, habían ocurrido como consecuencia de sus propios actos, por encontrarse el Sr. Miranda en estado de embriaguez el día del accidente.

Tras varios trámites procesales se celebró la vista en su fondo el 10 de marzo de 2005. En ella, según surge del expediente, testificaron seis (6) testigos. Específicamente, declararon el Sr. Miranda y la Sra. Rodríguez, así como su perito, Dr. Luis Sánchez Longo. Testificó también la Sra. Alicia Román, representante de Pitusa, el carnicero que alegadamente se encontraba en el lugar de los hechos, Sr. Carmelo Pérez y el perito fisiatra de Pitusa, Dr. Néstor Cardona.

El TPI dictó sentencia en la que declaró con lugar la demanda instada y condenó a Pitusa a pagar al Sr. Miranda la suma de sesenta mil ($60,000) y quince mil dólares ($15,000), por los daños físicos y sufrimientos mentales, respectivamente, y diez mil dólares ($10,000) por sufrimientos, ansiedades y angustias adicionales de su esposa la Sra. Nélida Rodríguez. Dispuso, además, el pago de costas, gastos del litigio y honorarios de abogado dada la temeridad de la parte peticionaria.

Inconforme con el dictamen del Tribunal de Instancia, Pitusa acudió ante nos solicitando la revocación de la sentencia recurrida y señala la comisión de los siguientes errores:

*"1. Erró el TPI al no imponer negligencia comparada al demandante por la caída sufrida por éste en el establecimiento comercial.*

*2. Erró el TPI en la apreciación de la prueba para adjudicar la cuantía de daños conferidos a la demandante-apelada.*

*3. Erró el Tribunal de Primera Instancia al cualificar al perito neurólogo como perito psiquiatra y permitir a éste enmendar su informe a pesar de la objeción de la parte demandada en cuanto a que era prueba nueva de la cual no se conocía.*

*4. Erró el Tribunal de Primera Instancia al no aplicar en este caso la doctrina de mitigación de daños.*

*5. Erró el TPI al resolver que procede la imposición de honorarios de abogado e intereses por temeridad a la parte demandada-apelante."*

Oportunamente, la parte apelante sometió la transcripción de la prueba oral. Debido a que por desperfectos técnicos se perdió la grabación del testimonio del Dr. Cardona, dictamos Resolución para ordenar a las partes preparar una Exposición Narrativa Estipulada del testimonio vertido por el referido perito. Asimismo, tuvimos el beneficio del alegato de la parte apelada, según requerido.

## II

El Artículo 1802 del Código Civil, 31 L.P.R.A. § 5141, establece el principio de la responsabilidad civil extracontractual. Dispone el mismo que: *"[e]l que por acción u omisión causa daño a otro, interviniendo culpa*

*o negligencia, está obligado a reparar el daño causado"*. Este precepto está inspirado en el deber general de todas las personas de actuar con la debida circunspección. Para que prospere una causa de acción bajo este artículo es necesario que concurran tres requisitos contenidos en la propia disposición: la ocurrencia de un daño real, un acto u omisión culposo o negligente y que exista una relación causal entre el acto u omisión y el daño sufrido. *Montalvo v. Cruz*, 144 D.P.R. 748 (1998); *J.A.D.M. V. Centro Com. Plaza Carolina*, 132 D.P.R. 785 (1993); *Soc. de Gananciales v. González Padín*, 117 D.P.R. 94, 105-06 (1994); *Hernández v. Fournier*, 80 D.P. R. 93, 96 (1957).

Nuestro ordenamiento civil extracontractual procura como su principal objetivo la reparación de un daño. Este se define como todo *"menoscabo material o moral que sufre una persona, ya en sus bienes vitales naturales, ya en su propiedad o en su patrimonio causado en contravención a una norma jurídica y por el cual ha de responder a otra"*. *García Pagán v.* Shiley, 122 D.P.R. 193 (1988); *Hernández v. Fournier, supra*, a las págs. 96-97.

En torno a la culpa o negligencia, la jurisprudencia la ha definido como la falta del debido cuidado, que a la vez consiste esencialmente en no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias. *Toro Aponte v. E.L.A.*, 142 D. P.R. 464, 473 (1997).

La responsabilidad por culpa o negligencia depende de la probabilidad de las consecuencias capaces de ser previstas por una persona precavida. *Ramos v. Carlo*, 85 D.P.R. 353, 358 (1957); *Montalvo v. Cruz, supra* en la pág. 756 (1998). Como describió el Tribunal Supremo en el caso de *Pacheco Pietri v. E.L.A.*, 133 D.P.R. 907, 939 (1993), en la pág. 939, el acto negligente es:

*"... el quebrantamiento del deber impuesto o reconocido por ley de ejercer, como lo haría un hombre prudente y razonable, aquel cuidado, cautela, circunspección, diligencia, vigilancia y precaución que las circunstancias del caso exijan, para no exponer [a otros] a riesgos previsibles e irrazonables de daños como consecuencia de la conducta del actor...."*.

En los casos en que el daño alegado se deba a una omisión, se configurará una causa de acción cuando: 1) exista un deber de actuar y se quebrante esa obligación; y 2) cuando de haberse realizado el acto omitido, se hubiese evitado el daño. *Bacó v. ANR Construction Corp.*, **2004 JTS 162**, 162 D.P.R. ____ (2004); *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294 (1990). La pregunta inicial que debe hacerse en estos casos es si *"existía un deber jurídico de actuar de parte del alegado causante del daño."* *Arroyo López v. E.L.A.*, 126 D.P.R. 682, 686-687 (1990).

En cuanto a la determinación de la relación causal entre el daño producido y la acción u omisión culposa o negligente, debe aplicarse el principio de causalidad adecuada. *Elba A.B. v. Universidad de Puerto Rico*, 125 D. P.R. 294 (1990). Esta doctrina dispone que no es causa toda condición sin la cual no se hubiese producido el resultado, sino la que generalmente lo produce, según la experiencia general. *Soc. de Gananciales v. Jerónimo Corp.*, 103 D.P.R. 127, 134 (1974); *Jiménez et al. v. Pelegrina Espinet et al.*, 112 D.P.R. 700, 704 (1982); *Sepúlveda de Arrieta v. Barreto*, 137 D.P.R. 735, 759 (1994).

En otras palabras, el demandante, para poder prevalecer, deberá hacer más que meramente probar que ha sufrido una pérdida. Le corresponde igualmente conectar ese daño o pérdida con la acción negligente que se alega en una relación de causalidad sobre criterios de probabilidad. *Portilla v. Carreras de Shira*, 95 D.P.R. 804, 812 (1968).

De ordinario, la obligación de reparar un daño dimana de un acto propio. Sin embargo, por excepción, se ha reconocido que se puede imputar responsabilidad a una persona por actos ajenos si existe un nexo jurídico

previo entre el causante del daño y el que viene obligado a repararlo. Art. 1803, Código Civil, 31 L.P.R.A. § 5142. *Vélez Colón v. Iglesia Católica*, 105 D.P.R. 123, 127 (1976). El Art. 1803, *supra*, que consagra la doctrina de responsabilidad vicaria o por acto ajeno, dispone en lo pertinente que:

"*La obligación que impone la sec. 5141 de este título es exigible, no sólo a los actos u omisiones propios, sino por los de aquellas personas de quienes se debe responder.*"

El Tribunal Supremo ha resuelto que la persona o empresa que mantiene abierto un establecimiento al público con el objeto de realizar en él operaciones comerciales para su propio beneficio, debe mantener dicho establecimiento en condiciones de seguridad tales, que las personas inducidas a penetrar en el mismo no sufran daño alguno. *Cotto v. C.M. Ins. Co.*, 116 D.P.R. 644, 650 (1985); *Rivera v. Supermercados Amigo, Inc.*, 106 D. P.R. 657, 660 (1977). El quebrantamiento de este deber por parte del establecimiento comercial da lugar a la responsabilidad civil extracontractual que surge del citado Artículo 1802, *supra*, *Soc. Gananciales v. G. Padín Co., Inc.*, 117 D.P.R. 94, 104 (1986). El cliente de una tienda espera, de ordinario que los pasillos y los corredores abiertos al público estén libres de obstáculos, trampas y sitios resbalosos. *Goose v. Hilton Hotels*, 79 D.P.R. 523, 530 (1956).

En los casos sobre reclamaciones por caídas, el Tribunal Supremo ha sido enfático al sostener que es necesario que la parte demandante pruebe, como parte esencial de la causa de acción que ejercita, la existencia de la condición de peligrosidad que ocasionó la caída y que dicha condición era de conocimiento de la parte demandada o que podría imputarse a ésta tal conocimiento. *Cotto v. C.M. Ins. Co., supra.* Esto se debe a que el dueño del establecimiento no es un asegurador absoluto de la seguridad de los clientes del negocio, y su deber sólo se extiende al ejercicio del cuidado razonable para su protección. Después de todo, una persona, mientras camina, puede resbalar y caerse al piso sin que medie negligencia de persona alguna. *Id.*, pág. 653.

Conforme a la jurisprudencia antes citada, para poder imputar negligencia a un establecimiento comercial por los accidentes sufridos dentro del mismo, la prueba de la parte demandante no puede apoyarse únicamente en establecer la existencia de una condición peligrosa. El mero hecho de que acontezca un accidente, no da lugar a inferencia alguna de negligencia. *Cotto v. C.M. Ins. Co., supra.* El Art. 1802, *supra*, fuente de nuestro derecho de daños, no permite tal conclusión. La prueba presentada deberá demostrar que el daño sufrido se debió a la negligencia que el demandante imputa. Se requiere, además, que la relación de causalidad entre el daño sufrido y el acto negligente no se establezca a base de una mera especulación o conjetura. *Castro Ortiz v. Mun. de Carolina,* 134 D.P.R. 783 (1993).

Como ya mencionamos, el Artículo 1802 del Código Civil establece que quien por su culpa o negligencia cause daño a otro, tiene el deber jurídico de repararlo. Ahora bien, nuestro ordenamiento civil en materia de daños también preceptúa que la negligencia del perjudicado, si bien no exime de responsabilidad al causante, conlleva la reducción de la indemnización. 31 L.P.R.A. § 5141; *Quiñones López v. Manzano Pozas,* 141 D.P.R. 139, 176 (1996). Cuando el perjudicado incurre en responsabilidad, el tribunal debe determinar el grado de negligencia de cada parte y reducir la indemnización de conformidad con tal distribución de responsabilidad a base de porcientos. Esta doctrina se conoce como la negligencia comparada. *Miranda v. E.L.A.*, 137 D.P.R. 700, 713 (1994).

Otra de las defensas oponibles en los casos bajo el Artículo 1802, es la doctrina de mitigación de daños. Esta postula el deber que tiene una persona que sufre algún daño de adoptar medidas razonables y a su alcance tendentes a reducir la magnitud y el monto de los mismos. *Fresh O Baking Co. v. Molinos de P.R.*, 103 D.P.R. 509, 520 (1975). En esencia y por su propia definición, su aplicabilidad presupone la existencia y realidad de un daño, pues de lo contrario nada habría que mitigar. *Fresh O Baking Co. v. Molinos de P.R., supra*, en la pág. 521. Al igual que otras normas de derecho, hay que evaluarla a la luz de las circunstancias particulares de cada caso, puesto que no existen formulas mágicas ni matemáticas que permitan aplicarla con facilidad y precisión.

*Id.*

La responsabilidad civil por daños y perjuicios se traduce en el deber de resarcir al damnificado, otorgándole un valor económico al daño sufrido. El resarcimiento o indemnización pecuniaria consiste en atribuir al damnificado la cantidad de dinero suficiente para compensar su interés perjudicado. Es como si se tratara de una subrogación real en la que el dinero ocupará el lugar de los daños y perjuicios sufridos; es una aplicación pecuniaria que crea una situación patrimonial que equivale a la destruida por el daño causado. *García Pagán v. Shiley Caribbean, Etc, supra*; *Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443, 455-456 (1985).

El derecho a ser compensado por daños no puede derrotarse meramente por el carácter especulativo que en alguna medida supone el cómputo de esos daños. *S.L.G. v. F.W. Woolworth and Co., supra*, a la pág. 81 (1997); *Odriozola v. S. Cosmetic Dist. Corp.* 116 D.P.R. 485, 510 (1985). Por esto se ha resuelto que, "*la gestión judicial de estimar y valorar los daños en casos como el de autos es difícil y angustioso, debido a que no existe un sistema de certera computación que permita llegar a un resultado exacto en relación con el cual todas las partes queden satisfechas y complacidas*". *Nieves Cruz v. U.P.R.*, 151 D.P.R. 150.

Lo anterior abona además a la doctrina de que los tribunales apelativos no debemos intervenir con la estimación de los daños que realicen los tribunales de instancia, a menos que las cuantías concedidas sean ridículamente bajas o exageradamente altas. *Blás Toledo v. Hosp. Guadalupe*, 146 D.P.R. 267, 339 (1998); *S.L. G. v. F.W. Woolworth and Co., supra*, en la pág. 83; *Quiñones López v. Manzano Pozas*, 141 D.P.R. 139, 178 (1996). La parte que solicita la reducción de la indemnización concedida está obligada a demostrar la existencia de las circunstancias que hacen meritorio que ellas se modifiquen. *Blás Toledo v. Hosp. Guadalupe, supra.*

Asimismo, es norma claramente establecida por el Tribunal Supremo de Puerto Rico que en ausencia de error manifiesto, pasión, prejuicio o parcialidad, no se intervendrá al nivel apelativo con las determinaciones de hechos y adjudicación de credibilidad hecha en instancia por el juzgador de los hechos. *Trinidad García v. Chade*, 153 DPR 280 (2001). Dispone la Regla 43.2 de las de Procedimiento Civil de Puerto Rico, 32 L.P.R.A., Ap. III, en lo pertinente, que "*[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el Tribunal Sentenciador para juzgar la credibilidad de los testigos*".

El Foro Apelativo no puede descartar y sustituir por sus propias apreciaciones basadas en un examen del expediente del caso, las determinaciones tajantes y ponderadas del foro de instancia. En particular, la determinación de credibilidad del tribunal sentenciador es merecedora de gran deferencia por parte del tribunal apelativo por cuanto es ese el foro que, de ordinario, está en mejor posición para aquilatar la prueba testifical desfilada, ya que fue quien oyó y vio declarar a los testigos. *Id.*; *Pueblo v. Bonilla Romero,* 120 D.P.R. 92, 111 (1987).

Aunque, ordinariamente, el Foro Apelativo no interviene con la apreciación de la prueba que formula el Tribunal de Primera Instancia, sí lo hace cuando un balance racional y justiciero de la totalidad de la prueba y de los documentos que obran en autos lleva a conclusiones distintas a las arrojadas por este último, ello fundamentado en la exigencia evidenciaria de la preponderancia de la prueba. *Negrón Rivera y Bonilla, Ex Parte,* 120 D.P.R. 61 (1987). Está claro que el arbitrio del juzgador de hechos es respetable, mas no absoluto. Por eso, una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de un tribunal apelativo. *Rivera Pérez v. Cruz Corchado,* 119 D.P.R. 8 (1987). Ahora bien, un tribunal apelativo no puede dejar sin efecto una sentencia cuyas conclusiones encuentran apoyo en la prueba desfilada. *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172, 181 (1985); *Pérez v. Hosp. La Concepción*, 115 D.P.R. 721, 728 (1984).

Esta doctrina deferencial enfrenta también excepciones cuando se dirimen testimonios periciales. Tampoco

aplica en circunstancias en que la evidencia consiste exclusivamente de prueba documental o de hechos aceptados o no controvertidos. *Sanabria v. Sucn. González*, 82 D.P.R. 885 (1961). Sobre la prueba pericial, el Tribunal Supremo ha sostenido que, como foro apelativo, no está obligado a *"seguir indefectiblemente la opinión, juicio, conclusión o determinación de un perito o facultativo ..."*. *Prieto v. Maryland Casualty Co.*, 98 D.P.R. 594 (1970). Por el contrario, ha señalado que ante esta prueba un tribunal apelativo está en igual posición que los tribunales de instancia. *Díaz García v. Aponte*, 125 D.P.R. 1 (1989).

En nuestra jurisdicción se ha adoptado una postura liberal en cuanto a quién puede declarar como perito. Para efectos de la Regla 53 de Evidencia, 32 L.P.R.A. Ap. IV, R. 53, basta con que el tribunal quede satisfecho de que el testigo tiene conocimientos especiales sobre la materia objeto de la declaración. No sólo cualifican los *"expertos"* en sentido estricto, sino cualquier persona que, a satisfacción del juez que preside la sala, tiene algún adiestramiento o conocimiento especial sobre la materia en controversia, incluyendo experiencia relevante. Solamente cuando surge objeción sobre la calificación pericial, es necesario ofrecer testimonio de base, el cual puede ser de cualquier naturaleza, siempre que sea pertinente y admisible, incluyendo el testimonio del propio perito.

Aunque, por ejemplo, dos médicos de distinta especialidad pudieran ser peritos sobre un mismo asunto o controversia, el galeno especialista sobre la materia en *issue* pudiera estar, en principio, en mejor posición para efectos del valor probatorio de su testimonio. Por supuesto, que ese factor no es determinante para la evaluación del testimonio pericial. Ello dependerá de la totalidad de la prueba y de las circunstancias particulares que rodean el caso. *Pueblo v. Rodríguez Otero*, 90 D.P.R. 861 (1964); *National Car Rental v. Caribe Motors*, 104 D.P.R. 74 (1975).

## III

En el presente caso, el TPI determinó que la parte demandante estableció con prueba preponderante que sufrió daños consistentes en fuertes dolores, espasmos y malestares en su cuerpo. Determinó también que ese daño fue causado por la omisión o negligencia de Pitusa al omitir mantener un lugar seguro para sus patrocinadores, a pesar de que sabía o debió saber de la condición peligrosa del lugar por la frecuencia de humedad. El TPI igualmente concluyó que Pitusa no adiestraba adecuadamente a sus empleados, ni proveía un protocolo para evitar este tipo de accidentes, sobre todo en ocasión de un especial anunciado en el periódico, lo que podía generar mayor cantidad de clientela en el lugar. Encontró el Tribunal que la omisión de la mínima diligencia de colocar una alfombra de fricción, eliminaba o reducía significativamente la incidencia de accidentes como éste, y ello es además demostrativo de la negligencia del apelante en este caso. Lo anterior convertía la caída sufrida por el Sr. Miranda en una previsible, sobre todo por la frecuente humedad del lugar en el que el TPI determinó que ocurrió el accidente. En consecuencia, la causa adecuada del accidente fue la referida omisión de la apelante Pitusa.

Ahora bien, la parte apelante adujo, en la alternativa, que el Sr. Miranda fue responsable concurrentemente de su caída en el supermercado por encontrarse en estado de embriaguez, por lo que no ejerció el cuidado y diligencia requerida para evitar el accidente. En vista de ello, le era aplicable la doctrina de negligencia comparada. No tiene razón. De acuerdo a las determinaciones de hechos del TPI, éste no le concedió credibilidad al testimonio vertido por la representante de Pitusa, Sra. Roldán, la cual alegaba la embriaguez del Sr. Miranda fundamentalmente a base de que tenía los ojos rojizos. Militaba en contra de esa alegación a la vista del TPI, el hecho de que el día del accidente la representante de Pitusa en su informe nada expuso acerca del alegado estado de embriaguez. Además, la parte apelada refutó la prueba vertida por Pitusa a satisfacción del Tribunal, a los efectos de que sus ojos rojizos era debido a su condición de hipertensión.

El rechazo de la alegación de negligencia comparada al menos en cuanto a la contribución del apelado en su caída, no luce arbitraria o claramente errónea al extremo que nos persuada a variar la decisión del Foro Sentenciador sobre este particular. Nos parece correcta la conclusión del Tribunal atribuyendo entera

responsabilidad sobre Pitusa, en vista de que la presencia del líquido en el lugar de la caída se vinculó razonablemente a la transportación de carnes a las neveras. La evidencia de la presencia del líquido en el suelo está ampliamente apoyada por la prueba. El hecho de tratarse de un líquido incoloro sobre un piso blanco hacía difícil percibirlo por cualquier cliente prudente y razonable. De igual manera nos parece razonable la conclusión del TPI a los efectos de que no había en el lugar alfombras de fricción al momento del accidente. No debe olvidarse que Pitusa no pudo asegurar la presencia de ella en el lugar. En tales circunstancias, resultaría altamente oneroso exigir al cliente identificar el peligro que constituia las condiciones previamente descritas en el negocio. El cuidado requerido a toda persona para evitar la ocurrencia de un daño no puede conllevar el detectar peligros que un cliente ordinario no habría de detectar. A tenor con lo anterior, el primer error señalado no se cometió.

Por estar estrechamente relacionados, consideramos conjuntamente el segundo y el cuarto error. Sobre la concesión de los daños, debemos igualmente deferencia a las cuantías otorgadas por el Foro de Instancia, siempre que éstas estén sustentadas por la prueba vertida. Nuestra intervención con esas determinaciones sólo se justifica frente a cuantías exageradamente altas o ridículamente bajas, como previamente expusimos. La valorización del daño constituye un elemento fundamental en nuestro ordenamiento jurídico. Conceder cuantías insuficientes por concepto de daños sufridos tiene el efecto de aminorar la responsabilidad civil a la que deben estar sujetas las actuaciones antijurídicas. Amadeo-Murga, *El Valor de los Daños en la Responsabilidad Civil,* Tomo II, 1997, pág. 31. Por el contrario, una valorización exagerada daría lugar al elemento punitivo, ajeno a nuestro sistema de derecho. Para que el sistema civil cumpla con sus propósitos, los tribunales deben propiciar que se logre la más razonable proporción entre el daño causado y la indemnización concedida. *Id.* Sin embargo, reconocemos que la función de valorar el daño es sumamente difícil, particularmente cuando se trata de daños no patrimoniales o morales. *Nieves Cruz v. U.P.R.,* 151 D.P.R. 150 (2000). Veamos la prueba en la que descansó el TPI para determinar el daño causado y, en función de ello, otorgar las compensaciones.

En el caso de autos, el Sr. Miranda presentó como perito al Dr. Sánchez Longo, neurólogo, para que testificara acerca de su condición física y emocional a causa de la caída. Conforme a la declaración del perito, el demandado experimenta 14% de incapacidad física permanente, específicamente le asigna 1% de limitación fisiológica general por el área cervical con espasmos; 7% por área lumbar debido a limitaciones en extensión y flexión lateral y 10% de limitación fisiológica general por las limitaciones de movimiento de cadera, causadas por dolor y no por anquilosis. No obstante, estas limitaciones que suman una incapacidad de 18% fueron reducidas, según el galeno, a un 14% tomando en consideración factores de edad y cambios degenerativos que podrían estar presentes en las articulaciones y columna vertebral del Sr. Miranda.

Es pertinente señalar que en la primera evaluación que hizo el Dr. Longo, éste recomendó un estudio de resonancia magnética (MRI) del área lumbar y una radiografía de la cadera derecha, y éstas nunca se realizaron. Las mismas, sin duda, permitían al médico hacer un diagnóstico más certero en cuanto a sus sospechas de limitaciones fisiológicas. El Sr. Miranda, sin embargo, no fue diligente en seguir las recomendaciones de su propio médico, aun cuando contaba, según surge del expediente, con un plan médico que cubría los gastos. Ello con mayor razón cuando la intervención del perito con el Sr. Miranda se produjo con miras al pleito contra Pitusa con el propósito de que éste preparara un Informe Médico Legal. Llama poderosamente la atención no haberse sometido a dichos estudios, los cuales hubieran evidenciado con mayor concreción y corrección las sospechas de limitación permanente, particularmente sobre su alegada condición de radiculopatía.

Conforme al perito de Pitusa, Dr. Cardona Cancio, para determinar una condición de incapacidad fisiológica permanente de ciertas áreas, como la lumbar, es necesario que el paciente se someta a imágenes o radiografías. Entiende que al área lumbar se le asignó determinado porciento de incapacidad permanente solamente por meras sospechas e inferencias. Ese no hubiera sido el caso si los estudios de resonancia magnética se hubieran llevado a cabo.

Según prescribe la Regla 16.6 de Evidencia, 32 L.P.R.A. Ap. IV, R. 16.6, se presume que toda evidencia superior habrá de ser adversa a la presentación de otra inferior. *Lleras v. Tió*, 102 D.P.R. 180 (1974). Evidentemente, hacer un diagnóstico sobre alguna condición o limitación física a base de sospechas o inferencias cuando existen instrumentos y tecnología que permite precisar la condición o minimizar errores en el diagnóstico, reduce el valor probatorio de esa prueba, sobre todo cuando el médico no es especialista en la materia sobre la que declara, mientras que la otra parte presenta evidencia parcial de un especialista en la materia que contradice esa prueba.

Como ya expresamos, los tribunales apelativos estamos en igual posición que los tribunales de instancia para dirimir controversias que descansen en prueba pericial. Cuando este Foro, como el propio TPI, se encuentra ante opiniones divergentes de peritos, debe realizar un balance de los méritos de cada opinión a base de los criterios de confiabilidad que aporte, y decidir sobre la base de la que resulte más razonable y correcta. En el presente caso, por las consideraciones anteriores, encontramos que la opinión pericial del Dr. Cardona luce más razonable y persuasiva, por lo que entendemos que el TPI incidió al apreciar la prueba pericial presentada y, por tanto, al decidir a base de ella la indemnización concedida.

Por otra parte, se desprende del expediente que al día siguiente de sufrir la caída, el Sr. Miranda asistió al Hospital de la Universidad de Puerto Rico en Carolina donde le fueron administrados medicamentos anti-inflamatorios, y fue diagnosticado con traumas en la espalda y rodilla, por lo que se le sometió a radiografías de Rayos X de las mencionadas áreas. Los resultados de éstas fueron negativos en cuanto a la existencia de fracturas. De acuerdo con el récord del Hospital, el apelado ese día abandonó voluntariamente el mismo, sin autorización médica. Posteriormente, asistió a la oficina del fisiatra, Dr. Faura Clavell, ██ quejándose de dolores fuertes, para lo cual se le recetó Relafen, mas no lo refirió a terapias físicas luego de realizarse un examen electrodiagnóstico. No surge del récord tratamiento adicional con este médico, más allá de la posterior preparación de su Informe Médico Legal.

Luego de esto, el 11 de octubre del 2000, el demandante fue evaluado en la oficina del Dr. Sánchez Longo, neurólogo. El diagnóstico del médico en esa primera evaluación neurológica fue un esguince lumbar, artropatía de la cadera derecha, sospecha de radiculopatía y depresión con estado de ansiedad, que eran preexistentes al accidente, pero que pudieron haber empeorado como consecuencia de éste. Le recomendó al Sr. Miranda obtener un informe de evaluación psiquiátrica, un estudio de resonancia magnética (MRI) y una radiografía de la cadera. Solamente logró conseguir el informe de evaluación psiquiátrica llevado a cabo por la psiquiatra, Dra. Fumero. Los demás estudios fueron recomendados para resolver o aclarar las sospechas de radiculopatía o traumas y de esta manera realizar el diagnóstico más preciso posible. Aún así, el Sr. Miranda nada hizo.

Cuando el Dr. Sánchez Longo lo examinó por segunda ocasión, el 7 de abril de 2004, esto es, más de tres años desde la primera evaluación, observó que persistían las condiciones que le aquejaban unos años antes y que algunas habían empeorado. Se trataba, según reportó, de dolores intensos, con limitaciones de movimientos del área lumbar, estado de depresión crónico-severo y temblores con pérdida de balance. ██ A su juicio, se trata de condiciones desencadenadas por la caída sufrida.

De lo anterior se observa que el Sr. Miranda esperó más de tres años para tratar su dolor, aun cuando se alega que sus dolencias *"habían empeorado aceleradamente"* como también determinó el TPI. No encontramos prueba en el expediente que nos indique qué acciones llevó a cabo el demandante para aliviar o tratarse esas dolencias, alegadamente empeoradas con el paso del tiempo. Del récord surge que el Sr. Miranda acudió a los médicos antes mencionados con miras al pleito a incoarse o ya incoado contra Pitusa y no con propósitos de buscar tratamiento médico para su condición. Resulta extraño e incomprensible que esta persona, quien debe actuar como un paciente prudente y razonable, frente a los malestares y condiciones sufridas, como surge de los Informes Médico Legales en autos, ni siquiera consultara por voluntad propia a un médico en el transcurso de esos años, aun cuando alegadamente su condición empeoraba.

Por otro lado, surge también del récord que la condición mental del Sr. Miranda era preexistente a su caída e incluso aún antes de la misma había sido referido por la Dra. Lourdes Vázquez a la Dra. Fumero, psiquiatra. Así también se reconoce en el propio Informe Pericial del Dr. Sánchez Longo, el cual afirma que la caída agravó la condición emocional ya existente del Sr. Miranda. Más aún, del récord médico de la Dra. Fumero, surge que al Sr. Miranda en una ocasión se le recomendó hospitalización parcial por su estado y condición mental. Ésta entendió que dicha hospitalización mejoraría la situación mental por la que atravesaba su paciente. El demandante se negó a acogerse a este tratamiento en contra de las recomendaciones de su médico. Véase, Récord Médico Dra. Fumero y referido médico. Exhibit XXVIII Págs.169, 172.

En vista de las anteriores circunstancias particularmente la ausencia de tratamiento médico del Sr. Miranda a su condición, el hecho de negarse a someterse a exámenes o estudios de resonancia magnética o *"CT Scan"*, al abandonar la sala de emergencia y al no acogerse a la hospitalización recomendada por la Dra. Fumero, el apelado faltó a su deber de mitigar daños.

Ahora bien, en el presente caso, en efecto, se produjo la caída del Sr. Miranda en el supermercado de la apelante. Asimismo hemos decidido que no habremos de intervenir con la determinación de Instancia sobre la atribución de negligencia a Pitusa. Igualmente, se evidenciaron ciertos traumas en la espalda y rodilla, dolores y malestares propios de dichos traumas y espasmos. No hay duda de que incidentes como éstos perturban la calidad de vida de quien lo sufra, afecta el descanso y particularmente el sueño, entre otros malestares y quebrantos emocionales típicos de estos eventos. Ello está ampliamente apoyado por la prueba que tuvo oportunidad de recibir el TPI.

No obstante lo anterior, la prueba presentada no es suficiente para sostener las condiciones especiales y la severidad que alega la parte apelada, tanto en el aspecto físico, como el emocional, al menos en conexión con esta caída. La evidencia aportada no satisface los criterios de la causalidad adecuada, según antes comentado, específicamente con respecto a la gravedad o empeoramiento de esas condiciones al grado adjudicado por el TPI. A ello se añade la falta de diligencia del Sr. Miranda para procurar el tratamiento médico necesario y recomendado, en violación de su deber de mitigar daños. Es muy improbable que un paciente prudente y razonable se quede de brazos cruzados, cuando se encuentra inmerso en una dolencia que se le ha ido agravando progresivamente, como se alega.

Dada la omisión del Sr. Miranda a su deber de mitigar daños y a que la prueba aportada, especialmente la pericial, no justificaba daños físicos y angustias mentales por las elevadas sumas concedidas a los apelados, procede su reducción por ser ellas exageradamente altas. Los errores segundo y cuarto alegados, se cometieron.

En consecuencia, se reduce la cantidad otorgada por los daños físicos sufridos por el Sr. Miranda a $20,000 y a $6,000 por las angustias mentales. En cuanto a su señora esposa y codemandarte se reducirá su indemnización a $3,000 por resultar igualmente exagerada la suma concedida. Esta partida, según aquí reducida, está más ajustada a la naturaleza y los daños realmente sufridos por su esposo a causa de la caída y a los que ella como cónyuge se le deben reconocer por las angustias y sufrimientos que estos eventos le han causado. No debe olvidarse, además, que parte de los inconvenientes que generan situaciones como éstas son obligaciones propias de la relación humana y jurídica que dimana del vínculo conyugal.

Por otra parte, la apelante ha levantado como tercer error que el Dr. Sánchez Longo no podía fungir como perito psiquiatra, toda vez que su especialidad es la neurología. También alegan que su testimonio en forma de opinión en cuanto a los sufrimientos y angustias mentales del Sr. Miranda, era prueba nueva que no se conocía, por lo que no debió admitirse.

Como ya sabemos, la admisión o aceptación de peritos se hace de manera liberal. El criterio es que el juzgador esté convencido de que el testimonio que se va ofrecer en el juicio le ilustrará sobre una materia o

asunto que esté en controversia, sobre el cual el juez no es experto.

En el presente caso, el TPI quedó convencido de que el perito de la parte demandante estaba apto y capaz para testificar y opinar sobre la materia y capacitado para emitir su opinión en cuanto al estado mental del Sr. Miranda. Como señala la parte apelada, el Dr. Sánchez Longo es un neurólogo de profesión, especialidad que ha estado históricamente relacionada a la psiquiatría y el cual posee, además, la experiencia necesaria para emitir una opinión acerca del estado mental del Sr. Miranda. Además, la falta de especialidad incide en el valor probatorio de la evidencia y no en admisibilidad de la prueba que el perito aporte. Entendemos que esta decisión no es una arbitraria o carente de toda base racional, por lo que no habremos de intervenir con la apreciación y determinación del TPI sobre el particular.

En cuanto al señalamiento de que el testimonio admitido en forma de opinión por el Dr. Sánchez Longo de los sufrimientos y angustias mentales del demandante era prueba nueva que se desconocía, sostenemos que este error no fue cometido. Del expediente surge claramente que la parte demandada tenía conocimiento de los informes médico-legales del Dr. Sánchez Longo, los cuales contenían observaciones sobre el estado mental del Sr. Miranda. Además, el récord médico de la Dra. Fumero era conocido por los demandados. Se recordará que el testimonio del Dr. Sánchez Longo estuvo basado fundamentalmente en ese récord y, por tanto, en él descansó sustancialmente para formular su opinión pericial sobre los sufrimientos y angustias mentales del demandante. Por ello, no se trató de prueba sorpresiva y realmente desconocida por la apelante, por lo que no vemos razón para no admitir tal testimonio por ese fundamento.

### IV

Por último, resta considerar el señalamiento de error relacionado con la imposición de honorarios de abogado.

La Regla 44.1(d) de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 44, dispone que: *"[e]n caso que cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta."*

El concepto *"temeridad"* ha sido ampliamente definido por el Tribunal Supremo de Puerto Rico. En términos generales se considerará temeraria toda aquella conducta que haga necesario un pleito que se pudo evitar, que lo prolongue innecesariamente o requiera a la otra parte efectuar gestiones innecesarias. *Blás v. Hosp. Guadalupe, supra*; *Torres Ortiz v. E.L.A.*, 136 D.P.R. 556 (1994); *Hawayek v. A.F.F.*, 123 D.P.R. 526 (1989); *Colondrés Vélez v. Bayrón Vélez*, 114 D.P.R. 833 (1983).

El propósito fundamental de la imposición de honorarios de abogado es penalizar o sancionar a aquellas partes que por su temeridad, obstinación, contumacia e insistencia en una actitud frívola o desprovista de fundamento, obligan a otra parte a asumir y sufrir las molestias, gastos, trabajos y consecuencias de un litigio innecesario. *Jarra Const. v. Axxis Corp*, 155 D.P.R. 64 (2001). La determinación de si un litigante ha procedido con temeridad descansa en la sana discreción del tribunal sentenciador. *Fernández v. San Juan Cement Inc.*, 118 D.P.R. 713 (1987); *Raoca Plumbing v. Trans World*, 114 D.P.R. 464, 468 (1983).

Finalmente, en relación con la cuantía impuesta por honorarios de abogado, reiteradamente se ha resuelto que no se intervendrá con ésta en apelación, a menos que la misma sea excesiva, exigua o constituya un abuso de discreción. *Corpak Inc. v. Ramallo Brothers*, 125 D.P.R. 724 (1990); *Ramírez Anglada v. Club Cala de Palma*, 123 D.P.R. 123 (1989).

En el caso de autos, el Tribunal impuso a la parte apelante la obligación de pagar al Sr. Miranda $5,000 por concepto de honorarios de abogado y costas. Luego de nuestro exhaustivo análisis de la prueba desfilada y en

función de lo dictaminado en la presente sentencia, entendemos que la imputación de temeridad a la parte demandada no procede. No detectamos temeridad de la parte demandada al defenderse de una demanda en su contra, frente a la cual tenía defensas válidas que levantar, algunas de las cuales incluso han encontrado eco ante este foro.

Por los fundamentos antes expuestos, se reduce las partidas concedidas en concepto de daños, según antes fijadas, se elimina la partida de honorarios de abogado y así modificada, se confirma la Sentencia apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.

Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones

### ESCOLIOS 2006 DTA 99

**1.** Existe controversia en cuanto a la fecha de la visita al galeno, si una semana después del accidente, como surge del Informe o 6 meses después, como afirma el Dr. Cardona, en su Informe. Asimismo, no está claro si el Sr. Miranda acudió a este médico a buscar tratamiento o para propósitos de que preparara un Informe Médico Legal como también afirma el Dr. Cardona. La realidad es que meses más tarde, el Dr. Faura Clavel produjo un Informe Médico Legal.

**2.** Los informes del fisiatra Dr. Faura y Dr. Sánchez Longo tienen igualmente inconsistencias en las fechas. La primera evaluación que hiciera el Dr. Sánchez Longo, fue para el 11 de octubre del 2000 y no el 11 de octubre de 2002 como indica su segundo Informe Médico Legal.