ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL III ESPECIAL

| | | |
|---|---|---|
| CARMEN AMADOR<br><br>Apelante<br><br>v.<br><br>WALMART PUERTO RICO, INC., FULANO Y MENGANO Y COMPAÑÍAS DE SEGURO A, B, C<br><br>Apelado | KLAN202400663 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Caguas<br><br>Civil Núm.: CG2021CV01676<br><br>Sobre: DAÑOS Y PERJUICIOS |

Panel integrado por su presidente, el Juez Figueroa Cabán, el Juez Bonilla Ortíz y la Jueza Mateu Meléndez.

**Figueroa Cabán, Juez Ponente**

**SENTENCIA**

En San Juan, Puerto Rico a 13 de septiembre de 2024.

Comparece Carmen Amador, en adelante la señora Amador o apelante, y nos solicita que revisemos la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala de Caguas, en adelante TPI.[1] Mediante dicho dictamen se declaró Ha Lugar la *Moción De Sentencia Sumaria* presentada por Walmart Puerto Rico, Inc., en adelante, Walmart o el apelado y se desestimó con perjuicio la demanda por daños y perjuicios presentada por la señora Amador.

Por los fundamentos que expondremos a continuación, se confirma la *Sentencia* apelada.

-I-

El 10 de julio de 2021, la señora Amador radicó una *Demanda* contra Walmart, Fulano y Mengano y

---

[1] Apéndice de la apelante, págs. 651-668.

Número Identificador

RES2024_____

Compañías de Seguro A, B y C.[2] Adujo, en síntesis, que Walmart había sido negligente al no bloquear o restringir oportunamente el uso de unas tarjetas de regalo tan pronto se le notificó que se utilizaron para defraudar a la apelante. Además, alegó que la falta de diligencia por parte de Walmart causó que unos estafadores le robaran la cantidad de $41,460.00. Por último, la señora Amador reclamó también la indemnización de los daños, más las costas, gastos y honorarios de abogado.

Por su parte, el apelado presentó su *Contestación a Demanda*[3] en la que negó haber incurrido en negligencia que le responsabilizara por el daño sufrido por la apelante. Al contrario, adujo que dicho daño se debió a los actos de terceras personas –los estafadores– y la propia negligencia de la señora Amador.

Culminado el descubrimiento de prueba, Walmart presentó una *Moción de Sentencia Sumaria*[4] en la que solicitó que se dictara sentencia sumaria a su favor, debido a que no existía controversia sobre hechos materiales conforme a lo dispuesto en la Regla 36 de Procedimiento Civil de 2009.[5] Destacó que según lo resuelto en los casos de *Chorney v. Target Corporation*[6] y *Patel v. Citibank Corporation*[7], Walmart no tenía un deber jurídico hacia la apelante, ya que el daño alegado no se consumó con la compra de las tarjetas de regalo sino, cuando la señora Amador raspó las

[2] *Id.*, págs. 1-14.
[3] *Id.*, págs. 16-21.
[4] *Id.*, págs. 53-71.
[5] Regla 36 de Procedimiento Civil de 2009 (32 LPRA Ap. V).
[6] *Chorney v. Target Corporation*, No. C-03-CV-20-001356, 2020 Md. Cir. Ct. LEXIS 9 (Md. Cir. Ct. Sept. 24, 2020).
[7] *Patel v. Citibank Corporation*, No. SA CV 19-1539-DOC-KES, 2019 U.S. Dist. LEXIS 227709 (C.D. Cal. Sept. 27, 2019).

tarjetas y le proveyó los códigos a los estafadores. Aludió a la extensa preparación académica de la apelante y la falta de medida alguna para evitar ser víctima de fraude.

En desacuerdo, la señora Amador sometió una *Solicitud en Oposición a: "Moción de Sentencia Sumaria" y de Sentencia Sumaria a favor de la Parte Demandante* […],[8] en la que argumentó que de la causa de acción contra el apelado surgía su omisión de actuar diligentemente para mitigar los daños una vez se le informó sobre el fraude. Actuación que, según expuso, provocó más pérdidas económicas. A su entender, los casos citados por Walmart[9] en su moción son distinguibles del caso de epígrafe.

Evaluadas las solicitudes de las partes, el TPI dictó *Sentencia*[10] en la que resolvió que no existía controversia sustancial sobre los siguientes hechos esenciales:

1. La demandante nació el 25 de enero de 1960. Para el 9 de enero de 2020, la demandante tenía 59 años.

2. En el 1981, la demandante obtuvo un grado de bachillerato en ciencias con una concentración en biología y menor en química de la Universidad de Puerto Rico.

3. Luego de sus estudios de bachillerato, la demandante trabajó como analista de laboratorio químico y analista de laboratorio en microbiología en la farmacéutica American Cyanamid donde laboró durante siete (7) años, hasta el año 1987.

4. En el 1987, la demandante comenzó a trabajar en la farmacéutica Bristol Myers Squibb, como supervisora del laboratorio de microbiología, puesto que tuvo durante cuatro años y luego fungió como supervisora del laboratorio químico por el período de un (1) año.

5. Posteriormente, la demandante fue ascendida al puesto de especialista en el área de "regulatory

---

[8] *Id.,* págs. 338-365.
[9] *Chorney v. Target Corporation*, *supra*, y *Patel v. Citibank Corporation*, *supra*.
[10] *Apéndice de la apelante,* págs. 652-668.

affairs and compliance", posición que ocupó durante cuatro (4) años.

6. Aproximadamente en el 1996, la demandante comenzó a trabajar en Allergan American como supervisora de laboratorio, puesto que ocupó menos de un (1) año.

7. La demandante fue ascendida a Oficial de Cumplimiento de Allergan American y se encargaba de los asuntos regulatorios conforme a la manufactura de medicamentos, posición que ocupó durante tres (3) años.

8. En el año 1999 o 2000, la demandante comenzó a trabajar en Rhode Poulenc Rorer como Gerente del Área de Asuntos Regulatorios y Cumplimiento, posición que ocupó durante dos (2) años. Luego ocupó la posición Gerente de "Quality Assurance" durante uno (1) ó dos (2) años.

9. Posterior a ocupar la posición de Gerente de Quality Assurance, fue ascendida a líder del área de Environmental Health and Safety.

10. Un año después, la demandante fue promovida a Directora de Operaciones.

11. Posteriormente, Rhone Poulenc Rorer vendió toda la operación de manufactura a otra compañía, llamada Inix, y basado en su experiencia y conocimiento, Inix le hizo una oferta para retenerla como directora de "business development".

12. Aproximadamente en el 2004, la demandante comenzó a trabajar en Wyeth como Directora de Calidad, específicamente para la operación de manufactura de penicilina y tres años después se le expandió su "rol" para la planta de penicilina y la planta de un segundo producto no penicilínico.

13. Pfizer compró a Wyeth, y la demandante permaneció con Pfizer hasta el 2010.

14. En el 2010, la demandante comenzó en Bristol Myers Squibb como Directora de Operaciones de Calidad donde laboró hasta el 2019.

15. En agosto de 2019, la demandante comenzó en Astra Zeneca como "Head de Quality" donde trabaja hoy en día.

16. En enero de 2020, la demandante tenía dos (2) números de teléfono -uno de la compañía y uno personal.

17. El 9 de enero de 2020, cerca del horario de almuerzo, la demandante se encontraba en su oficina cuando recibió una llamada telefónica desde un número "800" y la contestó. Escuchó una voz, la cual la demandante describió como una grabación que decía que la llamada estaba relacionada a una investigación por fraude del seguro social y que marcara el número uno (1) para ser transferida a una persona quien se identificó como agente federal.

18. La demandante recibió la llamada a su número de teléfono personal (787) 475-7504.

19. Durante esa llamada, la persona en la línea quien se había identificado como agente federal y con su número de "badge" o placa, le pidió a la demandante que le proveyera los últimos cuatro dígitos de su número de seguro social y ella se los dio.

20. En la llamada, le informaron a la demandante que su número de seguro social estaba relacionado a 18 cuentas de lavado de dinero y que ella estaba implicada en esa actividad de fraude.

21. La demandante testificó en su deposición que no tenía alguna razón para pensar que había cometido algún acto en su vida relacionado a lavado de dinero.

22. La persona en la llamada le indicó a la demandante que sus cuentas bancarias y de retiro iban a ser congeladas porque iban a estar sujetas a la investigación y que el proceso de investigación podría tomar de uno (1) a tres (3) años.

23. En la llamada, la persona que se identificó como "agente federal" le informó a la demandante que ella debía de mantener confidencialidad sobre la investigación. La demandante le informó al "agente federal" que su hija era abogada y le preguntó que si era posible que ella hablara con su hija.

24. El "agente federal" le contestó que no era recomendable que hablara con su hija porque si la contactaba, la podía involucrar civilmente.

25. La demandante no llamó a otro abogado ya que creyó la advertencia que le hizo el "agente federal" en cuanto que todo debía ser extremadamente confidencial esas primeras 24 horas debido a la acusación y que si llamaba a un abogado se podía incriminar más.

26. El "agente federal" le dio dos (2) alternativas a la demandante. La alternativa número uno (1) consistía en esperar 24 horas de haber sido notificada y que contactara un abogado que la representara en El Paso, Texas. Durante todo el tiempo que pudiera demorar todos los juicios pendientes, las cuentas bancarias de la demandante estarían congeladas.

27. La segunda alternativa era pasar por un proceso de identidad, que requería llenar un formulario y le permitiría a la demandante quedarse con alguna cantidad de dinero.

28. El formulario que tendría que cumplimentar, de seleccionar la alternativa número dos (2), debía de hacerlo en presencia de representantes del seguro social y la policía en Puerto Rico.

29. Le indicaron a la demandante que, de acogerse a la segunda alternativa, podía retirar de su banco la cantidad que ella entendiera pertinente, sin especificar cantidad.

30. Sin embargo, le indicaron a la demandante que solo podía retirar una porción de su dinero de las cuentas porque si retiraba todo el dinero de sus cuentas, se estaría auto incriminando.

31. En ese momento, la demandante tenía aproximadamente alrededor de $200,000 en su cuenta de banco.

32. La demandante le informó al "agente" que seleccionaba la segunda alternativa y que no tenía ningún problema en ser entrevistada para desasociar su identidad del fraude del cual la estaban acusando.

33. El "agente" entonces le indicó a la demandante que, habiendo seleccionado la segunda alternativa, ella iba a recibir otra llamada de un oficial de El Paso, Texas y que con esa persona iba a coordinar la entrevista con los representantes del seguro social y oficiales de la Policía de Puerto Rico.

34. La demandante colgó y a continuación recibió una llamada del alegado "oficial" y le informó a la demandante que él era el que iba a coordinar la entrevista con los agentes del seguro social y dos oficiales y que le llamaría al día siguiente.

35. El "oficial" le informó a la demandante que ella estaría recibiendo otra llamada ya directamente de la rama de investigaciones del seguro social para indicarle los pasos con respecto a la segunda alternativa que había seleccionado en cuanto a las cuentas de banco.

36. Como ya se le había anticipado, la demandante recibió otra llamada con voz de mujer, quien se le identificó como agente del área de investigaciones del Seguro Social y que la iba a guiar en cuanto a los pasos pertinentes para "proteger una cantidad" antes de que congelaran las cuentas esa noche.

37. La mujer que se identificó como "agente del área de investigaciones del seguro social" le instruyó a la demandante que "mantuviera total comunicación con ella" y que evitara comunicación con "cualquier otra persona" ya que la podía poner en una situación sospechosa y "afectar el proceso". Que la "línea iba a estar abierta con ella en todo momento" y que de haber algún problema "podía mantener comunicación, también por texto, pero que "ella tenía que tener la línea de voz abierta."

38. La "agente del área de investigaciones del Seguro Social" se identificó como Carol Watson.

39. Las instrucciones que la demandante recibió y siguió por parte de Carol Watson era que no podía colgar el teléfono y que Watson la tenía que escuchar hablando en todo momento.

40. En ese momento, la demandante agarró sus cosas en su oficina y salió hacia el banco a retirar una cantidad de dinero.

41. La demandante retiró $50,000.00 de la sucursal de Banco Popular de Canóvanas.

42. El oficial del Banco Popular le preguntó a la demandante la razón para el retiro de $50,000 y la demandante le respondió que era para "consolidar deudas".

43. Mientras la demandante llevaba a cabo la gestión de retirar el dinero de su cuenta en el Banco Popular, ésta se mantuvo en la llamada para que Carol Watson escuchara la conversación entre la demandante y el personal del banco.

44. Después de retirar los $50,000.00, Carol Watson le instruyó a la demandante que ésta no podía quedarse con el dinero que retiró en efectivo ya que eso la incriminaría. Le informó que tenía que "digitalizar" el dinero en efectivo de manera que se pudiera transferir el mismo a un mecanismo seguro del gobierno federal.

45. Carol Watson le instruyó a la demandante que la forma de "digitalizar" el dinero en efectivo era adquiriendo tarjetas de regalos con el logo de Walmart.

46. Carol Watson le fue impartiendo instrucciones a la demandante de cada localización donde tenía que ir a adquirir las tarjetas de regalo pero que en todo momento tenía que "estar con ella en el teléfono".

47. Una vez la demandante adquiriera las tarjetas, Carol Watson le instruyó a la demandante que tenía que raspar el área del código de seguro, tomarle una fotografía y enviársela por texto a un número que Watson le proveyó para comenzar el proceso de digitalización del dinero en el "Security Government Vault" que era el mecanismo federal aprobado para poder proteger alguna cantidad de dinero.

48. Carol Watson le enviaba a la demandante un "pin" mediante texto con la localización que debía ir a comprar las tarjetas de regalo.

49. La demandante fue a aproximadamente como a cinco (5) Supermercados Amigo en Bayamón y Guaynabo para realizar las compras de tarjetas de regalo.

50. Inmediatamente luego de que la demandante terminaba cada compra de tarjetas [de] regalo, regresaba a su vehículo y le facilitaba la información de las tarjetas de regalo a Carol Watson mediante una foto del recibo y de cada tarjeta "raspada" así mostrando el número de seguridad de cada tarjeta. La demandante enviaba el texto al número de teléfono que le indicó Carol Watson.

51. Este fue el procedimiento que siguió la demandante con todas las tarjetas de regalos que adquirió.

52. En alguno de los Supermercados Amigo le preguntaron a la demandante para qué eran las

tarjetas de regalo y ella indicó que eran donaciones para las personas damnificadas por los terremotos de 2020 que habían ocurrido días antes en Puerto Rico.

53. La llamada entre la demandante y Carol Watson duró desde la 1:00 p.m. hasta aproximadamente 8:00 p.m.

54. La demandante no llamó a ese número 1-800 para cerciorarse de que efectivamente ese número de teléfono correspondía a una agencia o instrumentalidad federal o del orden público.

55. La noche del 9 de enero de 2020 y al acabar la llamada con Carol Watson, la demandante llegó sola a su casa.

56. Ya en su hogar, la demandante sintió una preocupación de que le habían timado. No obstante, todo le había parecido "tan veraz," que no llamó a nadie creyendo que era un "proceso legítimo."

57. El día siguiente, la demandante habló con su cuñada y se dio cuenta que había sido víctima de fraude. La cuñada de la demandante fue quien la "hizo ver que había sido un engaño," al indicarle que parecía ser un "scam," que procediera a su banco y que abriera una querella, entre otras.

58. Luego de enganchar con su cuñada, la demandante primero fue al Banco Popular de la Milla de Oro, la sucursal que le quedaba más cerca. La demandante entonces fue a un cuartel de la policía en el área de Guaynabo y luego, por instrucciones del cuartel, a uno en Canóvanas.

59. Después del 10 de enero de 2020, la demandante recibió un cheque de Walmart por la cantidad de aproximadamente $8,000.00, cantidad que corresponde a la cantidad que los estafadores no pudieron utilizar y no cambió.[11]

Para el tribunal "el daño que reclama la Sra. Carmen Amador no ocurrió cuando compró las tarjetas de regalo, sino cuando ella misma le proveyó y facilitó a la estafadora los números o PIN de todas las tarjetas de regalo."[12] Además, el foro primario aclaró que:

> [e]l único hecho del caso que nos ocupa que es distinto a los hechos particulares de Chorney y Patel es que, tanto en el Banco Popular cuando la demandante Carmen Amador hizo el retiro de $50,000, así como cuando fue a los Supermercados Amigos, le preguntaron a la demandante con qué propósito estaba llevando [a] cabo las transacciones. La demandante optó por seguir las instrucciones de la farsante "Carol Watson", mantuvo la calma y les mintió, todo

---

[11] *Id.*
[12] *Id.*, pág. 666.

ello mientras mantenía a la farsante escuchando en el teléfono todas las conversaciones. Al Banco Popular, la demandante le dijo que utilizaría el efectivo para "consolidar deudas," mientras que a Supermercados Amigo le dijo que las tarjetas eran "donaciones" para las personas damnificadas por los terremotos de 2020. Dichas admisiones, aun si Walmart tuviera un deber legal de actuar, derrotan las alegaciones de la demandante Carmen Amador.[13]

El foro sentenciador, sostuvo además, que:

[c]onforme al testimonio bajo juramento de la demandante en su disposición, al preguntarle a la demandante sobre la razón de la compra de las tarjetas de regalo, la demandante mintió y ofreció una razón que pareció posible- los terremotos, los cuales habían ocurrido apenas tres (3) días antes de que la demandante recibiera la llamada. Por lo tanto, aun de Walmart haber tenido un deber hacia la demandante -lo cual no es el caso- indagó sobre la razón de la compra de las tarjetas.[14]

Para el TPI:

es necesario tomar en consideración unos factores importantes sobre la demandante Carmen Amador. La Sra.               Carmen Amador es una mujer adulta quien tiene una vasta preparación académica e intelectual. Ha ocupado posiciones importantes en varias farmacéuticas en Puerto Rico, tales como especialista de asuntos regulatorios y de cumplimiento, supervisora de laboratorios, Oficial de Cumplimiento, Gerente de Asuntos Regulatorios y Cumplimiento, Gerente de Seguridad de Calidad ("Quality Assurance"), Líder de Salud y Seguridad Ambiental, Directora de Operaciones, Directora de Calidad, entre otros. Por lo tanto, la Sra. Carmen Amador debió tener el cuidado ordinario para darse cuenta de que todo lo que sucedió el 9 de enero de 2020 era sencillamente imposible de creer. Es inescapable preguntarnos ¿qué tiene que ver el Seguro Social con tarjetas de regalo de Walmart? ¿Cómo es posible que la demandante, siendo una persona profesional e intelectual, haya creído todas las representaciones que le hicieron los estafadores y haya seguido sus instrucciones? La señora Amador no era una anciana ya que tenía 59 años. Su propia hija es abogada de profesión y omitió en comunicarse con ella. Además, la señora Amador tenía dos (2) teléfonos de celular – uno personal y uno de su trabajo los cuales tenía consigo el 9 de enero de 2020. Esta pudo haber utilizado uno de sus celulares y llamar a cualquiera de los números de teléfonos de donde había recibido todas las llamadas y cerciorarse de que las mismas eran legítimas. Sin embargo, no lo hizo. La demandante no ejerció el más mínimo cuidado ordinario para evitar ser víctima de fraude.[15]

En consideración a lo anterior, el TPI decretó "Ha Lugar" la *Moción De Sentencia Sumaria* presentada por Walmart y declaró "No Ha Lugar" la solicitud de sentencia sumaria presentada por la apelante.

---

[13] *Id.*
[14] *Id.*, pág. 667.
[15] *Id.*

Inconforme, la señora Amador presentó una *Solicitud de Reconsideración & de Determinaciones Adicionales de Hecho y de Derecho*[16], que el TPI declaró "No Ha Lugar".[17]

Aún inconforme con lo resuelto, la apelante acudió ante nosotros mediante el recurso de epígrafe en el que señaló que el TPI cometió los siguientes errores:

A. ABUSÓ EN SU DISCRECIÓN EL FORO A QUO AL DESCARTAR EL REQUERIMIENTO DE ADMISIONES PARA PROCEDER A DICTAR SENTENCIA SUMARIA A FAVOR DE LA DEMANDADA.

B. ABUSÓ DE SU DISCRECIÓN Y ACTUÓ CON PREJU[I]CIO EL FORO A QUO AL: 1. INDICAR QUE, NO CITAMOS LAS LÍNEAS O SECCIONES QUE CONTRADIJERAN LOS HECHOS EN CONTROVERSIA DE LA DEMANDADA; 2. ESENCIALMENTE DESGLOSAR LA OPOSICIÓN A SENTENCIA SUMARIA Y CONCEDER SENTENCIA SUMARIA A FAVOR DE LA PARTE DEMANDADA CUANDO ESTA NO APORTÓ PRUEBA PARA CONTRADECIR A LA DEMANDA DEL HECHO MEDULAR DE LA RESPONSABILIDAD DE WALMART DE ACTUAR CON DILIGENCIA PARA RESCATAR LAS CUANT[Í]AS NO APROPIADAS AL MOMENTO DE NOTIFIC[Á]RSELES EL FRAUDE; Y 3. AL EQUIPARAR EL CASO DE MARRAS AL DE CHORNEY Y PATEL.

Luego de revisar los escritos de las partes y los documentos que obran en autos estamos en posición de resolver.

**-II-**

**A.**

La sentencia sumaria es un mecanismo procesal extraordinario y discrecional, que tiene el propósito de facilitar la solución justa y rápida de los litigios y casos civiles que no presenten controversias genuinas de hechos materiales y que, por lo tanto, no ameritan la celebración de una vista en su fondo.[18] Se trata de un mecanismo para aligerar la tramitación de un caso, cuando de los documentos que

---

[16] *Id.*, págs. 670-685.
[17] *Id.*, pág. 698.
[18] *Cruz Cruz v. Casa Bella Corp.*, 2024 TSPR 47; *Aponte Valentín et al. v. Pfizer Pharm.*, 208 DPR 263, 277-278 (2021); *Meléndez González, et al. v. M. Cuebas*, 193 DPR 100, 109 (2015); *Reyes Sánchez v. Eaton Electrical*, 189 DPR 586, 594-595 (2013); *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010); *ELA v. Cole*, 164 DPR 608, 624-625 (2005).

acompañan la solicitud surge que no existe disputa sobre algún hecho material y lo que procede es la aplicación del derecho.[19] Este mecanismo procesal solo procede en casos donde "el Tribunal tenga ante sí la verdad sobre todos los hechos pertinentes".[20] De existir la mínima duda sobre si un hecho esencial está controvertido, el Tribunal debe de proceder a denegar la moción de sentencia sumaria y celebrar un juicio en su fondo.[21]

Al respecto, la Regla 36.1 de Procedimiento Civil dispone que un reclamante debe "presentar una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación solicitada".[22]

El Tribunal Supremo de Puerto Rico, en adelante TSPR, ha declarado enfáticamente que quien se opone a una solicitud de sentencia sumaria tiene que ceñirse a ciertas exigencias en lo atinente a los hechos.[23] Esto es, recae sobre el oponente la obligación de citar específicamente los párrafos, según enumerados en el escrito de sentencia sumaria, que entiende están en controversia, y para cada uno, detallar la evidencia admisible que fundamenta su alegación, y especificar la página o sección de la evidencia que contradice o

---

[19] *Cruz Cruz v. Casa Bella Corp.*, *supra*; *Aponte Valentín et al. v. Pfizer Pharm.*, *supra*; *Meléndez González, et al. v. M. Cuebas*, *supra*; *Ramos Pérez v. Univisión*, *supra*, pág. 214.
[20] *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 DPR 714, 721 (1986). Véase, además, *Torres Pagán et al. v. Mun. de Ponce*, 191 DPR 583, 598 (2014).
[21] *Nieves Díaz v. González Massas,* 178 DPR 820, 848 (2010); *ELA v. Cole Vázquez, supra*; *López v. Miranda*, 166 DPR 546, 563 (2005).
[22] Regla 36.1 de Procedimiento Civil de 2009 (32 LPRA Ap. V)
[23] *Meléndez González, et al. v. M. Cuebas*, *supra*, págs. 110-111; *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 432 (2013).

refuta el hecho.[24] Además, el oponente puede someter hechos materiales adicionales que alegadamente no están en controversia y que impiden la solución sumaria del conflicto.[25] De así hacerlo, tiene la responsabilidad de, al igual que el proponente, enumerar los hechos en párrafos separados e indicar la pieza de evidencia que sostiene el hecho, con referencia específica a la parte de la evidencia que lo apoya.[26]

Sobre los requerimientos que exige la Regla 36.3 de Procedimiento Civil, *supra*, a la parte que se opone a una solicitud de sentencia sumaria, el TSPR expresó lo siguiente:

> Es por ello que mediante estas nuevas disposiciones nuestro ordenamiento procesal expresamente le exige a la parte oponente examinar cada hecho consignado en la solicitud de sentencia sumaria y, para todos los que considere que existe controversia, identificar el número del párrafo correspondiente y plasmar su versión contrapuesta fundamentada en evidencia admisible. La numeración no es un mero formalismo, ni constituye un simple requisito mecánico sin sentido. Por el contrario, tiene un propósito laudable, por lo que su relevancia es indiscutible y queda claramente evidenciada luego de una interpretación integral de las enmiendas acogidas en el 2009. De lo contrario, las enmiendas a la Regla 36 de Procedimiento Civil de 2009, *supra*, no tendrían valor práctico alguno.[27]

A su vez, el Alto Foro ha reiterado que:

> La parte que se opone a una Moción de Sentencia Sumaria tiene el deber de presentar una Oposición a la solicitud presentada y de acuerdo con los requisitos de forma que exige la citada Regla 36 de Procedimiento Civil, traer a la atención del Tribunal la evidencia que demuestra que existen hechos materiales en controversia.[28]

Por otro lado, la Regla 36.3 (c) de Procedimiento Civil dispone, que:

> [L]a parte contraria no podrá descansar solamente en las aseveraciones o negaciones contenidas en sus alegaciones, sino que estará obligada a contestar en forma tan detallada y específica, como lo haya hecho

---

[24] *Id.*; Regla 36.3 de Procedimiento Civil de 2009 (32 LPRA Ap. V).
[25] *SLG Zapata-Rivera v. J.F. Montalvo*, *supra*.
[26] *Id.*; Regla 36.3 (b)(3) de Procedimiento Civil de 2009 (32 LPRA Ap. V).
[27] *SLG Zapata-Rivera v. J.F. Montalvo*, *supra*, pág. 434.
[28] *Meléndez González, et als. v. M. Cuebas*, *supra*, pág. 122.

la parte promovente. [De lo contrario], se dictará la sentencia sumaria en su contra si procede.[29]

En *Meléndez González et al. v. M. Cuebas,* el TSPR estableció el estándar específico que debe utilizar el Tribunal de Apelaciones para revisar una sentencia sumaria, a saber:

> **Primero**, reafirmamos lo que establecimos en *Vera v. Dr. Bravo*, *supra*, a saber: el Tribunal de Apelaciones se encuentra en la misma posición del Tribunal de Primera Instancia al momento de revisar Solicitudes de Sentencia Sumaria. En ese sentido, está regido por la Regla 36 de Procedimiento Civil, … y aplicará los mismos criterios que esa regla y la jurisprudencia le exigen al foro primario. Obviamente, el foro apelativo intermedio estará limitado en el sentido de que no puede tomar en consideración evidencia que las partes no presentaron ante el Tribunal de Primera Instancia y no puede adjudicar los hechos materiales en controversia, ya que ello le compete al foro primario luego de celebrado un juicio en su fondo. La revisión del Tribunal de Apelaciones es una *de novo* y debe examinar el expediente de la manera más favorable a favor de la parte que se opuso a la Moción de Sentencia Sumaria en el foro primario, llevando a cabo todas las inferencias permisibles a su favor.
>
> **Segundo**, por estar en la misma posición que el foro primario, el Tribunal de Apelaciones debe revisar que tanto la Moción de Sentencia Sumaria como su Oposición cumplan con los requisitos de forma codificados en la Regla 36 de Procedimiento Civil … y discutidos en *SLG Zapata-Rivera v. JF Montalvo*….
>
> **Tercero**, en el caso de revisión de una Sentencia dictada sumariamente, el Tribunal de Apelaciones debe revisar si en realidad existen hechos materiales en controversia. De haberlos, el foro apelativo intermedio tiene que cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil y debe exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos. Esta determinación puede hacerse en la Sentencia que disponga del caso y puede hacer referencia al listado numerado de hechos incontrovertidos que emitió el foro primario en su Sentencia.
>
> **Cuarto**, y por último, de encontrar que los hechos materiales realmente están incontrovertidos, el foro apelativo intermedio procederá entonces a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia.[30]

Debemos añadir, que la Regla 36.5 de Procedimiento Civil establece que: "[l]as declaraciones juradas para sostener u oponerse a la

---

[29] Regla 36.3 (c) de Procedimiento Civil de 2009 (32 LPRA Ap. V).
[30] *Meléndez González et al. v. M. Cuebas*, *supra*, pags. 118-119, 122. (Énfasis en el original) (citas omitidas).

moción se basarán en el conocimiento personal del (de la) declarante.[31] Contendrán aquellos hechos que serían admisibles en evidencia y demostrarán afirmativamente que el(la) declarante está cualificado(a) para testificar en cuanto a su contenido".[32]

Finalmente, no procede dictar sentencia sumaria cuando existen elementos subjetivos de intención, propósitos mentales o negligencia; cuando la credibilidad de las partes sea esencial; o cuando el caso trata controversias complejas o involucra asuntos de interés público.[33]

**B.**

En lo pertinente al caso de autos, puntualizamos que, como norma, los reclamos bajo el derecho de daños se rigen, "tanto en su forma como en su contenido, por el sistema del derecho civil."[34] Por excepción, en ciertas instancias se permite el empleo del derecho común a modo de derecho comparado.[35] Sin embargo, a los efectos del resultado alcanzado, fundamentaremos nuestra determinación exclusivamente en el derecho civil.

Cónsono con lo anterior, la norma principal aplicable a la controversia es el Artículo 1802 del Código Civil de 1930, vigente al momento de los hechos. Este dispone que "el que por acción u omisión causa daño a otro, interviniendo culpa o negligencia,

---

[31] Regla 36.5 de Procedimiento Civil de 2009 (32 LPRA Ap. V).
[32] *Id.; Roldán Flores v. M. Cuebas et al.,* 199 DPR 664, 677 (2018).
[33] *Jusino et als. v. Walgreens,* 155 DPR 560, 579 (2011); *González Aristud v. Hosp. Pavía,* 168 DPR 127, 138 (2006).
[34] *Valle v. Amer. Inter. Ins. Co.,* 108 DPR 692, 695 (1979). Véase, además, *Vigoreaux Lorenzana v. Quizno´s,* 173 DPR 254, 262 (2008).
[35] *Valle v. Amer. Inter. Ins. Co., supra,* pág. 697.

está obligado a reparar el daño causado".[36] Por consiguiente, para imponer responsabilidad civil es necesario alegar y probar: un daño, un acto u omisión culposa o negligente y un nexo causal entre el daño y la referida acción culposa o negligente.[37]

En primer lugar, el concepto de daño se define como "todo aquel menoscabo material o moral que sufre una persona, ya en sus bienes vitales naturales, ya en su propiedad o en su patrimonio, causado en contravención a una norma jurídica y por el cual ha de responder otra".[38]

En segundo lugar, la negligencia consiste en no precaver las consecuencias lógicas de una acción u omisión que cualquier persona prudente y razonable bajo las mismas circunstancias hubiese previsto.[39] Este deber de previsibilidad se refiere a todo daño probable, no a todo daño posible.[40] Así pues, "la norma de responsabilidad es que el riesgo que debe preverse debe estar basado en probabilidades y no en meras posibilidades".[41] De modo que, "[p]ara que ocurra un acto negligente como resultado de una omisión tiene que existir un deber de cuidado impuesto o reconocido por ley, y que ocurra el quebrantamiento de ese deber."[42]

---

[36] Artículo 1802 del Código Civil (31 LPRA sec. 5141).
[37] *Sucn. Mena Pamias et al. v. Meléndez et al.*, 212 DPR 758, 768 (2023); *SLG Colón-Rivas v. ELA*, 196 DPR 855, 864 (2016); *López v. Dr. Cañizares*, 163 DPR 119, 132 (2004).
[38] *Santini Rivera v. Serv Air, Inc.*, 137 DPR 1, 7 (1994).
[39] *Sucn. Mena Pamias et al. v. Meléndez et al.*, *supra*, pág. 768; *López v. Porrata Doria*, 169 DPR 135, 164 (2006).
[40] *Cruz Flores et al. v. Hosp. Ryder et al.*, 210 DPR 465, 484 (2022); *Montalvo v. Cruz*, 144 DPR 748, 756 (1998). [U]n resultado razonablemente previsible "no se extiende a todo peligro imaginable que concebiblemente pueda amenazar la seguridad… sino a aquel que… llevaría a una persona prudente a anticiparlo." Véase, *SLG Colón-Rivas v. ELA, supra*, pág. 865.
[41] *López v. Porrata Doria, supra,* págs. 164-165.
[42] *Elba ABM v. UPR*, 125 DPR 294, 308 (1990), citando a H.M. Brau Del Toro, *Los daños y Perjuicios Extracontractuales en Puerto*

En tercer lugar, la causa establece el vínculo entre la acción u omisión y el daño.[43] En cuanto a la determinación del nexo causal, en nuestro ordenamiento jurídico impera la doctrina de la causalidad adecuada. Esto es, "la causa es la condición que ordinariamente produce el daño, según la experiencia general".[44] Sin embargo, "[e]ste nexo causal puede ser roto por la ocurrencia de un acto extraño al primero. "[L]a relación causal puede interrumpirse (*causa interveniens*) por la interrupción de un tercero interviniente, pero en tal caso la inmisión de su acto debe ser consciente, intencional o antijurídica."[45]

A esto hay que añadir, que una persona no puede ser responsable por una causa remota. De modo que, "[u]n daño parece ser el resultado natural y probable de un acto negligente si después del suceso, y mirándolo retroactivamente el acto que se alega ser negligente, tal daño aparece como la consecuencia razonable y ordinaria del acto."[46]

En lo aquí pertinente, es necesario destacar que "la difícil determinación de cuándo existe un nexo causal entre el daño producido por un acto delictivo de un tercero y la omisión de cumplir con la obligación de tomar precauciones, medidas de seguridad y protección, no puede ´resolverse nunca de una manera plenamente satisfactoria mediante reglas abstractas, sino que en los casos de duda ha de resolverse por el

---

*Rico*, 2da ed., San Juan, Publicaciones. JTS, 1986, Vol. I, pág. 183.
[43] *Sucn. Mena Pamias et al. v. Meléndez et al.*, *supra*, pág. 768; *Nieves Díaz v. González Massas*, *supra,* págs. 844-845.
[44] *Cruz Flores et al. v. Hosp. Ryder et al.*, *supra*, págs. 484-485; *Jiménez v. Pelegrina Espinet*, 112 DPR 700, 704 (1982).
[45] *Elba ABM v. UPR*, *supra*, pág. 310.
[46] *Montalvo v. Cruz*, *supra*, págs. 756-757; *Soc. de Gananciales v. Jerónimo Corp.*, 103 DPR 127, 133-134 (1974).

juez según su libre convicción, ponderando todas las circunstancias´".[47]

Conviene mencionar, que cuando se alegue que el daño es producto de una omisión, es obligatorio demostrar la existencia o inexistencia de un deber de actuar por parte del alegado causante del daño, su incumplimiento y que de haberse cumplido dicho deber se hubiese evitado el daño.[48] "[A]nte una reclamación fundada en responsabilidad por omisión, la pregunta de umbral es si existía un deber jurídico de actuar de parte del alegado causante del daño."[49]

Finalmente, en el ámbito comercial, el deber de actuar va a depender del tipo de empresa de que se trate. Así pues, la obligación de mantener unas medidas de protección de partes y terceros contra ataques criminales va a depender de la actividad que desarrolle el empresario.[50] Sobre este asunto, el TSPR ha expresado que esta protección "es independiente de la que puedan ofrecer las agencias de seguridad pública."[51]

## c.

El requerimiento de admisiones o autenticidad de documentos es un escrito que una parte le dirige a otra para que admita la certeza de ciertos hechos o la autenticidad de ciertos documentos.[52] Aunque la

---

[47] *Elba ABM v. UPR*, *supra*, pág. 310-311. (citas omitidas).
[48] *Hernández Vélez v. Televicentro*, 168 DPR 803, 812-813 (2006); *Administrador v. ANR*, 163 DPR 48, 59 (2004); *Arroyo López v. ELA*, 126 DPR 682, 686 (1990).
[49] *Arroyo López v. ELA*, *supra*, págs. 686, 687.
[50] *Santiago v. Sup. Grande*, 166 DPR 796, 808-809 (2006); *Elba ABM v. UPR*, *supra*. La Opinión también cita el Artículo 1057 del Código Civil de 1930, (31 LPRA sec. 3021), que específicamente dispone que "[l]a culpa o negligencia del deudor consiste en la omisión de aquella diligencia que exija la naturaleza de la obligación y corresponda a las circunstancias de las personas, del tiempo y del lugar."
[51] *Elba ABM v. UPR*, *supra*, pág. 309.
[52] R. Hernández Colón, *Derecho Procesal Civil*, 6ta ed., San Juan, LEXISNEXIS DE PUERTO RICO, INC., 2017, pág. 369.

jurisprudencia considera que el requerimiento de admisiones no es propiamente un mecanismo de descubrimiento de prueba, ciertamente es un instrumento eficaz para delimitar las controversias y para lograr admisiones que acorten la audiencia y eviten gastos innecesarios.[53]

Este recurso procesal está regulado por la Regla 33 de Procedimiento Civil que en lo aquí pertinente dispone:

> (a) *Requerimiento de admisión.* – A los efectos de la acción pendiente únicamente, una parte podrá requerir por escrito a cualquier otra parte que admita la veracidad de cuales quiera materias dentro del alcance de la Regla 23.1 de este apéndice contenidas en el requerimiento, que se relacionen con cuestiones de hechos u opiniones de hechos o con la aplicación de la ley a los hechos, incluyendo la autenticidad de cualquier documento descrito en el requerimiento…
>
> Cada materia sobre la cual se requiera una admisión deberá formularse por separado. Todas las cuestiones sobre las cuales se solicite una admisión se tendrán por admitidas, a menos que dentro de los veinte (20) días de haberle sido notificado el requerimiento, o dentro del término que el tribunal concediese mediante moción y notificación, la parte a quien se le notifique el requerimiento le notifica a la parte que requiere la admisión, una contestación suscrita bajo juramento por… la parte o una objeción escrita sobre la materia. [54]

Si la parte a quien se le notificó no cumple en el término establecido, "las cuestiones sobre las cuales se solicitó la admisión, automáticamente se tendrán por admitidas".[55] No obstante, para que el incumplimiento constituya una admisión automática, en el documento de requerimiento de admisiones se tiene que apercibir al promovido sobre las consecuencias del incumplimiento.[56] Cumplido este requisito, "la admisión de un requerimiento se considerará definitiva, salvo

---

[53] J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, 2da. ed., Estados Unidos de Norte América, Publicaciones JTS, 2011, T. III, pág. 1001.

[54] (32 LPRA Ap. V, R.33).

[55] (Cita omitida). *Rivera Prudencio v. Mun. de San Juan*, 170 DPR 149, 172 (2007).

[56] *Menéndez García v. Tribunal Superior*, 101 DPR 667, 669 (1973). Véase, además, J.A. Echevarría Vargas, *Procedimiento Civil Puertorriqueño*, 2012, pág. 206;

que el tribunal permita su retiro o una enmienda a ésta.[57]

Finalmente, nuestro más alto foro ha declarado que "[e]n el ejercicio de su discreción el tribunal debe interpretar la regla de forma flexible para favorecer en los casos apropiados que el conflicto se dilucide en los méritos".[58] Por lo que a pesar de que las disposiciones de la Regla 33 son mandatorias y no directivas, "lo que requiere que haya un cumplimiento sustancial con las mismas", al aplicarlas e interpretarlas no se puede permitir que consideraciones técnicas prevalezcan en detrimento de la justicia sustancial.[59]

**D.**

Por otro lado, es norma firmemente establecida que los tribunales apelativos no intervienen con el manejo de los casos por parte del Tribunal de Primera Instancia, "salvo que se demuestre que hubo un craso abuso de discreción o que el tribunal actuó con prejuicio o parcialidad, o que se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo […]".[60]

Por su parte, la discreción es la facultad "para decidir en una u otra forma, esto es, para escoger entre uno o varios cursos de acción."[61] De modo que, el ejercicio de las facultades discrecionales por el foro

---

[57] *Rivera Prudencio v. Mun. de San Juan, supra*, pág. 171.

[58] *Audiovisual Lang. v. Sist. Est. Natal Hnos.,* 144 DPR 563, 573-574 (1997).

[59] *Id.,* págs. 574-575.

[60] *Lluch v. España Service Sta.*, 117 DPR 729, 745 (1986). Véase, además, *Banco Popular de Puerto Rico v. Gómez Alayón*, 2023 TSPR 145, 213 DPR ___ (2023); *Cruz Flores et al. v. Hosp. Ryder et al., supra*, pág. 484; *SLF Fernández-Bernal v. RAD-MAN et al., supra*, pág. 338; *VS PR, LLC v. Drift-Wind*, 207 DPR 253, 273 (2021); *Umpierre Matos v. Juelle, Mejía*, 203 DPR 254, 275-276 (2019); *Citibank et al. v. ACBI et al.*, 200 DPR 724, 736 (2018); *SLG Torres-Matundan v. Centro Patología*, 193 DPR 920, 933 (2015).

[61] *VS PR, LLC v. Drift-Wind, supra.*

de instancia merece nuestra deferencia salvo que incurra en algunas de las conductas previamente mencionadas.[62]

-III-

Para la apelante el TPI abusó de su discreción al no dar por admitidos los requerimientos cursados a la apelada. Sostiene, además, que el foro sentenciador incidió al no reconocer la obligación de Walmart de mitigar daños. Específicamente, a su entender, erró también, al ignorar que Walmart no ejerció el nivel de diligencia y cuidado necesario, una vez se le apercibió del fraude y se le solicitó que paralizara los desembolsos "cuando aún habían $41,000.00 en fondos recuperables."

Por su parte, Walmart entiende que el TPI no abusó de su discreción al permitirle contestar los requerimientos de admisiones y notificarlos a la apelante. Por el contrario, ello significa que el foro recurrido puso en vigor la política judicial de interpretar flexiblemente los requerimientos de admisiones y de ese modo promover que los casos se ventilen en sus méritos. En todo caso, la señora Amador renunció a cualquier reclamación sobre la determinación del TPI de no dar por admitidos los requerimientos, porque no presentó oportunamente un recurso de *certiorari* ante este tribunal intermedio.

La apelada sostiene, además, que la apelante no se opuso a la moción de sentencia sumaria, conforme a los parámetros de la Regla 36 de Procedimiento Civil. Ello responde a que descansó solamente en sus alegaciones y en cambio, no identificó la prueba

---

[62] *Gómez Márquez et al. v. El Oriental*, 203 DPR 783, 794 (2020).

documental, si alguna, que refutara las alegaciones de la sentencia sumaria.

Luego de revisar *de novo* el expediente, concluimos que la *Moción de Sentencia Sumaria* cumple esencialmente con los requisitos de la Regla 36.3(a) de Procedimiento Civil. Así pues, incluye una exposición breve de las alegaciones de las partes y una relación concisa y organizada, en párrafos enumerados, de los hechos esenciales sobre los cuales no hay controversia con las citas de las deposiciones y de los documentos admisibles en evidencia en los cuales apoya su contención. También expone las razones por las cuales se debe de dictar sentencia sumaria y el remedio solicitado. [63]

En cambio, aunque la *Oposición a Solicitud de Sentencia Sumaria…*[64] cumple esencialmente con la mayoría de los requisitos de forma de la Regla 36 (b), sin embargo, violenta lo que a nuestro juicio son los más importantes, a saber, los incisos (b)(2) y (3) de dicho cuerpo procesal. De modo que, si bien incluye como anejos dos deposiciones y varias contestaciones a interrogatorios, no establece la relación, si alguna, de los documentos con los hechos que se reputan controvertidos o con aquellos que se entiende que no lo están. Así pues, para efectos de la disposición procesal comentada, de nada sirve identificar unas alegaciones y luego yuxtaponer unos documentos, si estos no permiten contestar el siguiente interrogante: ¿Cuáles hechos están en controversia y cuáles no?

---

[63] Apéndice de la apelante, págs. 52-336.
[64] *Id.*, págs. 337-633.

Conviene añadir, que resulta curioso y también elocuente que, aunque la moción de sentencia sumaria se basa exclusivamente en la deposición de la señora Amador, en cambio, la réplica no se apoya principalmente en esta. Por el contrario, la oposición pretende fundamentarse principalmente en las deposiciones de su hija y de la abogada de Walmart, documentos y personas marginales a la trama de fraude y engaño que vivió la señora Amador el 9 de enero de 2020.

Contrario a la normativa procesal aplicable, la oposición de la apelante se basa en alegaciones, algunas "conclusorias" y otras acomodaticias, en todo caso, desprovistas de apoyo en evidencia admisible. En fin, la señora Amador solo se fundamentó en sus alegaciones y definitivamente no contestó en forma tan detallada y específica como lo hizo Walmart.

De conformidad con el estándar de revisión aplicable, como la apelante no se opuso a la *Moción de Sentencia Sumaria* de acuerdo con la Regla 36, las 60 determinaciones de hechos propuestas por Walmart se consideran incontrovertidas. Consecuentemente, corresponde ahora revisar si el TPI aplicó correctamente el derecho. Anticipamos que sí lo hizo. Veamos.

Para comenzar, Walmart no es responsable por negligencia por omisión porque no tiene un deber de actuar. Esto es así, ya que no se puede concebir racionalmente, que en un caso tan singular como el de autos, cualquier comercio en general y en lo que nos ocupa Walmart en particular, tuviese el deber de impedir que la señora Amador -en ausencia de alguna

restricción en su capacidad jurídica de actuar de la cual Walmart tuviera conocimiento- comprara las tarjetas de regalo. Por el contrario, Walmart rebasó sus obligaciones jurídicas para con la apelante al inquirir sobre el motivo de tan peculiar transacción comercial.[65]

Sobre el particular, coincidimos con la apreciación del TPI, en el sentido de que el daño no ocurrió cuando la apelante compró las tarjetas de regalo en diversos locales comerciales de la apelada. Por el contrario, ocurrió después de salir de las tiendas de Walmart cuando la señora Amador "le proveyó y facilitó a la estafadora los números o PIN de todas las tarjetas de regalo".[66] Posterior a este evento "el daño ya estaba hecho" y como veremos más adelante, hay otros elementos en la cadena de sucesos que generaron el perjuicio, que preceden a Walmart en materia de responsabilidad civil, incluyendo claro está, la conducta negligente de la propia apelante.

Como intimamos en el párrafo anterior, la apelante fue negligente al infringir crasamente el deber de cuidado que nuestro sistema de derecho le impone a cualquier persona. Así pues, es sencillamente inaceptable, desde el punto de vista jurídico, que una persona con una formación universitaria en Ciencias Naturales; con una carrera destacada y ascendente en la competitiva industria farmacéutica; y que a la fecha de los hechos tenía 59 años de edad; fuera parte, por más de siete horas, de

---

[65] *Id.*, pág. 60, véase hecho incontrovertido número 53.
[66] *Id.*, pág. 666.

una trama fantástica que parece extraída de un libreto de "Candid Camera".

Para confirmar esta aseveración basta formular los siguientes interrogantes: ¿cómo la digitalización de una cantidad de dinero mediante la compra de tarjetas de regalos de Walmart contribuiría a resolver un problema de lavado de dinero con la Administración de Seguro Social?; ¿por qué, teniendo a su disposición dos números de teléfono celulares, no corroboró la identidad de la llamada de los estafadores? La respuesta que parece adelantar la parte apelante de que "sentía mucha presión" es a todas luces ingenua o temeraria y, en todo caso, inverosímil.

De lo previamente expuesto podemos concluir que la omisión de Walmart de impedir que la señora Amador comprara las tarjetas de regalo y omitiera bloquearlas una vez notificado el fraude, no es la causa próxima de los daños incuestionablemente sufridos por la apelante. Este evento no es la condición que, según la experiencia general, produjo la pérdida monetaria. A nuestro entender, en la cadena de eventos que generó este lamentable desenlace preceden, no solo en el orden del tiempo, sino también en su grado de eficacia y causalidad, la conducta ilícita de los estafadores y la propia negligencia de la apelante. En otras palabras, si después de ocurrida la pérdida monetaria miramos retroactivamente la cadena de sucesos, aquella aparece como la consecuencia razonable de ambos eventos, a saber, la conducta delictiva de los estafadores y la negligencia de la señora Amador.

En todo caso debemos recordar que, en caso de dudas sobre el nexo causal, hay que considerar el análisis del juez de instancia.

Lo anterior es suficiente para resolver definitivamente la controversia ante nos, a saber, que la señora Amador no tiene una causa de acción de daños y perjuicios contra Walmart. Sin embargo, la apelante entiende que el resultado hubiese sido distinto, si el TPI hubiera admitido unos requerimientos de admisiones que le envió a Walmart. No le asiste la razón.

En primer lugar, cualquier reclamación con el manejo del requerimiento de admisiones es, en esta etapa, irremediablemente tardía. Esto es así, porque la determinación interlocutoria cuestionada data del 9 de junio de 2022 y la apelante nunca solicitó su revisión ante este tribunal intermedio. En consecuencia, la decisión relacionada con el trámite del requerimiento de admisiones constituye la ley del caso.

En segundo lugar, la operación de la figura procesal de requerimiento de admisiones no es ajena a la discreción judicial. Basta revisar el propio texto de la Regla 33 de Procedimiento Civil para observar que una cuestión se tendrá por admitida, entre otros supuestos, si no se contesta **"dentro del término que el Tribunal concediese"**[67] **o salvo que el tribunal permitiese su retiro o enmienda.**[68]

Como si lo anterior fuera poco, el foro recurrido negó categóricamente haber admitido los requerimientos en controversia: "…este Tribunal en ningún momento

---

[67] Regla 33 de Procedimiento Civil, *supra*. (Énfasis suplido)
[68] *Rivera Prudencio v. Mun. de San Juan, supra.* (Énfasis suplido)

emitió una Orden dando por admitido el Requerimiento de Admisiones."[69]  No tenemos criterio alguno para cuestionar dicha declaración.

Finalmente, al examinar el contexto procesal en el que el TPI emitió su determinación, concluimos que la misma constituye una decisión sobre el manejo del caso,[70] que no presenta ninguna de las circunstancias que justificaría nuestra intervención revisora.

## -IV-

Por los fundamentos previamente expuestos, se confirma la *Sentencia* apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.  La Jueza Mateu Meléndez concurre con el resultado sin opinión escrita.


                              Lcda. Lilia M. Oquendo Solís
                     Secretaria del Tribunal de Apelaciones

---

[69] Apéndice del apelante, pág. 655.
[70] *Lluch v. España Service Sta.,* 117 DPR 729 (1986).